133 P.3d 458 (2006)
156 Wash.2d 844
Mary A. CUMMINS, individually, and as Personal Representative of the Estate of Leon V. Cummins, deceased, Petitioner,
v.
LEWIS COUNTY, a municipality, Respondent,
City of Centralia, a municipality; Qwest Corporation, formerly doing business as U.S. West Communications, a foreign corporation; Northern Telecom Meridian Systems, Inc., a Washington corporation; Northern Telecom International, Inc., a Washington corporation; Plant Equipment, Inc., a foreign corporation; Informer Computer Systems, Inc., a foreign corporation; SCC Communications Corp., a foreign corporation; Christopher Bird, a minor; S. Paula Bird, and "John Doe" Bird, husband and wife, individually and their marital community; and John Does 1-5, Defendants.
No. 76249-0.
Supreme Court of Washington, En Banc.
Argued September 13, 2005.
Decided May 4, 2006.
*459 Terry E. Lumsden, Law Offices of Terry E. Lumsden, Tacoma, Devin T. Theriot-Orr, Howard Mark Goodfriend, Edwards Sieh Smith & Goodfriend PS, Seattle, for Petitioner/Appellant.
Melanie T. Stella, Robert William Novasky, Burgess Fitzer PS, Tacoma, for Appellee/Respondent.
ALEXANDER, C.J.
¶1 The question presented in this case is whether, under the public duty doctrine, an actionable "special relationship" is created between a member of the public and a government entity when an individual places a "911 call," identifies the nature of his medical emergency, provides a street address but not his name, and "hangs up" prior to either requesting help or receiving an oral assurance from the operator that medical aid will be dispatched. We answer "no" to that question, concluding that there is neither a statutory nor a common law duty on the part of a county to dispatch medical aid under such circumstances. We decline also the petitioner's invitation to eliminate the express assurance requirement of the special relationship inquiry in cases involving 911 calls and medical emergencies. We, therefore, affirm the Court of Appeals' decision upholding the Lewis County Superior Court's summary judgment dismissing the petitioner's wrongful death action.

I. FACTS
¶2 On December 15, 1997, the Lewis County emergency dispatch call center received a 911 call. The 911 dispatcher heard what she believed to be the voice of an adult male say, "1018 `E' Street, heart attack." Clerk's Papers at 343. The caller hung up the telephone before the dispatcher could obtain additional information and before she could respond.
¶3 On the date of this incident, Lewis County had in place an "enhanced 911 (E911) system[ ]." Id. at 303. Unlike a regular 911 service, the E911 system automatically displays the telephone number and location from which a call is placed. In this instance, the system indicated that the "`heart attack call'" was placed from a pay telephone in the vicinity of a grocery store on Tower Street in Centralia. Id. at 376. That location is roughly five blocks from the "E" Street address furnished by the caller. A few minutes before the call in question, the 911 dispatcher had fielded a so-called "prank" 911 *460 call from the same Tower Street pay telephone. Id.
¶ 4 Immediately after receiving the "heart attack" call, the dispatcher dialed the pay telephone number and received a busy signal. Another operator placed a telephone call to the "E" Street address and received a recorded answer from an answering machine. This caused the dispatcher to treat the "heart attack" call as a "hang up," meaning she did not immediately send medical aid to either location. Id. at 338. Instead, she dispatched a Centralia police officer to conduct an investigation.
¶5 In response to the directions from the dispatcher, a Centralia police officer drove to the location of the pay telephone. Upon arriving there, he stopped a young man who was in the vicinity. The boy was well-known to the Centralia Police Department due to his prior contacts with that department. When questioned, the youngster said that he had placed the 911 call. The officer then issued a warning to the boy and cleared the call with 911 as a "suspicious circumstance." Id. at 369. The dispatcher indicated to the officer that she was surprised that a boy made the "heart attack" call given that it was a man's voice that she had heard. The officer responded that the boy tried to make his voice sound "old." Id. at 349. After clearing the call, the police officer proceeded to the "E" Street address. He did not, however, stop at that location or attempt to contact anyone who may have been at the home.
¶6 Several hours later, Mary A. Cummins, the plaintiff and petitioner here, returned home to the "E" Street address and found her husband, Leon V. Cummins, dead on the kitchen floor. Mrs. Cummins called 911. The E911 system identified her call as coming from 1018 "E" Street. This prompted the police officer who had earlier contacted the young man in the vicinity of the pay telephone to recontact him. The youth told the officer that he had lied about making the earlier call. The E911 system was thereafter checked and found to be functioning properly.
¶ 7 Mrs. Cummins brought a wrongful death action in Lewis County Superior Court against Lewis County and the City of Centralia in her own capacity as well as in a representative capacity. She alleged that her husband's death was the result of the negligence of the Lewis County 911 emergency dispatch unit as well as that of the Centralia police department which had responded to the call. The trial court granted a summary judgment dismissing Mrs. Cummins's complaint against both defendants. The court held that she failed to show that the county or the city owed Mr. Cummins a duty of care it did not owe to the public generally and that her claims were thereby barred by the public duty doctrine. Division Two of the Court of Appeals affirmed the superior court.[1] Mrs. Cummins sought and was granted review by this court.[2]

II. LEWIS COUNTY'S MOTION TO STRIKE
¶8 During our consideration of this case, respondent Lewis County moved to strike a supplemental brief that Mrs. Cummins filed in response to an amicus curiae brief submitted by the Washington State Trial Lawyers Association Foundation (Foundation).[3] The Foundation asked in its brief that this court permanently "inter" the public duty doctrine.[4] In her response, Mrs. Cummins *461 adopted for the first time this line of reasoning and joined the Foundation in requesting that this court abandon the public duty doctrine. Mrs. Cummins argued additionally, and for the first time, that the special relationship exception to the doctrine should henceforth be limited to analyzing a government's duty only in those cases involving the criminal acts of third parties.
¶ 9 Lewis County correctly notes that Mrs. Cummins initially sought this court's review only on the questions of whether a special relationship with the county had been established and whether the express assurance requirement needed to establish that particular relationship be eliminated or relaxed for medical emergency callers. It is a well-established maxim that this court will generally not address arguments raised for the first time in a supplemental brief and not made originally by the petitioner or respondent within the petition for review or the response to petition. See Douglas v. Freeman, 117 Wash.2d 242, 258, 814 P.2d 1160 (1991). Because Mrs. Cummins seeks a form of relief in her supplemental brief that she did not seek in her petition for review, Lewis County's motion to strike is granted.

III. THE PUBLIC DUTY DOCTRINE AND THE SPECIAL RELATIONSHIP EXCEPTION THERETO
¶ 10 Mrs. Cummins contends that the trial court and Court of Appeals each erred in not concluding that an actionable special relationship was created between Lewis County and Leon Cummins when Mr. Cummins telephoned 911 and stated both his physical location and the nature of his medical emergency.[5] Pointing to a long line of Washington public duty doctrine cases, Lewis County asserts that both courts below correctly determined that Mrs. Cummins does not have an actionable claim in negligence because the 911 dispatcher who fielded Mr. Cummins's call did not give him an "express assurance" of help upon which he could have "justifiably relie[d]." Resp't Lewis County's Suppl. Br. at 7.
¶11 When reviewing an order on summary judgment, this court engages in the same inquiry as the trial court. Babcock v. Mason County Fire Dist. No. 6, 144 Wash.2d 774, 784, 30 P.3d 1261 (2001). Summary judgment is proper where the entire record demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. In a negligence action, the determination of whether an actionable duty was owed to the plaintiff represents a question of law to be decided by the court. Tincani v. Inland Empire Zoological Soc'y, 124 Wash.2d 121, 128, 875 P.2d 621 (1994). A question of law is reviewed do novo. Babcock, 144 Wash.2d at 784, 30 P.3d 1261.
¶12 A threshold negligence determination is whether a duty of care is owed to the plaintiff. Id. at 784-85, 30 P.3d 1261 (quoting Taylor v. Stevens County, 111 Wash.2d 159, 163, 759 P.2d 447 (1988)). In negligence actions against a government entity, Washington courts follow the rule that
to be actionable, the duty must be one owed to the injured plaintiff, and not one owed to the public in general. This basic principle of negligence law is expressed in the "public duty doctrine". Under the public duty doctrine, no liability may be imposed for a public official's negligent conduct unless it is shown that "the duty breached was owed to the injured person as an individual and was not merely the breach of an obligation owed to the public in general (i.e., a duty to all is a duty to no one)."
Taylor, 111 Wash.2d at 163, 759 P.2d 447 (citations omitted) (quoting J & B Dev. Co. v. King County, 100 Wash.2d 299, 303, 669 P.2d 468 (1983)).
¶13 The public duty doctrine does not serve to bar a suit in negligence against a *462 government entity. As a result of the enactment in 1967 of RCW 4.96.010, which did away with Washington's shield of absolute sovereign immunity, local governments such as a county may be liable for damages arising out of their tortious conduct, or the tortious conduct of its employees "to the same extent as if they were a private person or corporation." RCW 4.96.010(1); Bailey v. Town of Forks, 108 Wash.2d 262, 265, 737 P.2d 1257, 753 P.2d 523 (1987). In this light, the doctrine serves as a framework for courts to use when determining when a governmental entity owes either a statutory or common law duty to a plaintiff suing in negligence. See, e.g., Jenifer Kay Marcus, Washington's Special Relationship Exception to the Public Duty Doctrine, 64 WASH. L.Rev. 401, 401 (1989).[6]
¶14 There are four common law "exceptions" to the public duty doctrine.[7] If one of these exceptions applies, the government will be held as a matter of law to owe a duty to the individual plaintiff or to a limited class of plaintiffs. Bailey, 108 Wash.2d at 268, 737 P.2d 1257. At issue in this case is application of the special relationship exception.

A. Has Mrs. Cummins satisfied the three requirements of the special relationship exception?
¶15 The special relationship exception allows tort actions for negligent performance of public duties if the plaintiff can prove circumstances setting his or her relationship with the government apart from that of the general public. Taylor, 111 Wash.2d at 166, 759 P.2d 447. A special relationship imposing an actionable duty to perform arises between the plaintiff and a government entity when "`(1) there is a direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the general public, and (2) there are express assurances given by a public official, which (3) gives rise to justifiable reliance on the part of the plaintiff.'" Beal v. City of Seattle, 134 Wash.2d 769, 785, 954 P.2d 237 (1998) (quoting Taylor, 111 Wash.2d at 166, 759 P.2d 447).

1. Was there privity between Mr. Cummins and Lewis County?
¶16 Mrs. Cummins asserts that privity was established at the point when Mr. Cummins telephoned 911 and was able to state both his physical location and the nature of his medical emergency to an operator. Lewis County contends that Division Two of the Court of Appeals correctly held that in order for privity to exist in this context some form of communication between the 911 caller and the operator must occur. See Cummins v. Lewis County, 124 Wash.App. 247, 254, 98 P.3d 822 (2004).
¶17 Mrs. Cummins correctly observes that a plaintiff can establish privity without having to prove the plaintiff herself communicated with the government entity. See Bratton v. Welp, 145 Wash.2d 572, 577, 39 P.3d 959 (2002). She is not correct, however, that *463 prior case law establishes that the privity element is satisfied merely by the act of placing a call to 911. Washington case law shows the required communication between the injured party and 911 by which the plaintiff is set apart from the general public requires both a(1) telephone conversation and (2) an affirmative promise or agreement to provide assistance. Accord id.; Beal, 134 Wash.2d at 785, 954 P.2d 237; Chambers-Castanes v. King County, 100 Wash.2d 275, 286, 669 P.2d 451 (1983).
¶18 In each of the above cases, the plaintiff established privity by showing that the 911 dispatcher affirmatively communicated some form of "promise" that assistance would be sent. Furthermore, in each of these cases, the 911 caller established a dialogue with the government official after identifying the nature of his emergency and communicating his identity to the government official, thereby separating himself from the public at large. None of these activities have been shown here, the record revealing that Mr. Cummins hung up the telephone before a promise of assistance could be given and before an on-going dialogue could be established. Furthermore, he did not identify himself. This one-way communication was not sufficient to establish privity in the 911 context.

2. Was an express assurance given?
¶19 Mrs. Cummins must also show Mr. Cummins received an express assurance from a government official. Mr. Cummins must have sought an express assurance of assistance, and the government must have unequivocally given that assurance. Babcock, 144 Wash.2d at 789, 30 P.3d 1261. "A government duty cannot arise from implied assurances." Id. (citing Honcoop v. State, 111 Wash.2d 182, 192-93, 759 P.2d 1188 (1988); Taylor, 111 Wash.2d at 167, 759 P.2d 447).
¶20 Mrs. Cummins does not contend that the 911 operator unequivocally gave Mr. Cummins an express promise that medical assistance would be dispatched. Under Washington case law, this absence of an express assurance to dispatch assistance by the operator precludes this court from finding as a matter of law that Mrs. Cummins has established an actionable duty against the county. Accord Babcock, 144 Wash.2d at 791, 30 P.3d 1261.
¶21 To meet the express assurance requirement, Mrs. Cummins argues more generally that the nature of the E911 system provides an "inherent" government assurance that medical assistance will be forthcoming once a call is placed. This argument fails. Even if this court were to decide that the very nature of the 911 system provides the public with an "inherent" promise of emergency aid dispatch, Mrs. Cummins cites no authority for equating an "inherent" assurance to the required express assurance. Thus, we conclude that an inherent assurance, like an implied assurance, does not provide us with a sufficient basis for finding an actionable duty under the special relationship exception. See Meaney v. Dodd, 111 Wash.2d 174, 180, 759 P.2d 455 (1988); Taylor, 111 Wash.2d at 168, 759 P.2d 447 (overruling in part J & B Dev. Co., 100 Wash.2d 299, 669 P.2d 468 (1983), a case imposing government liability in part on the government's implicit assurances that the plaintiff had complied with building codes). Because Mrs. Cummins fails to show the 911 operator gave Mr. Cummins an unequivocal statement that assistance would be forthcoming, we conclude as a matter of law that no express assurance was provided.

3. Was there justifiable reliance on the part of Mr. Cummins?
¶22 Mrs. Cummins must further demonstrate sufficient facts showing that Mr. Cummins justifiably relied on an explicit assurance given by the 911 operator. Babcock, 144 Wash.2d at 791-92, 30 P.3d 1261. To bind the government, Mr. Cummins must have relied upon the assurance to his detriment. Id. at 793, 30 P.3d 1261.
¶23 Even after viewing the facts and inferences in a light most favorable to her, we are satisfied that Mrs. Cummins has not shown that Mr. Cummins justifiably relied upon an explicit promise of assistance or that he relied on an assurance to his detriment. First, as noted above, the 911 operator did not communicate an express assurance of assistance *464 upon which Mr. Cummins could have relied. Second, even if this court were to infer that Mr. Cummins was provided an assistance promise, Mrs. Cummins does not show Mr. Cummins was induced to and did purposefully remain at his physical location awaiting help in reliance upon the dispatcher's assistance assurance. Accord Beal, 134 Wash.2d at 786, 954 P.2d 237 (justifiable reliance found when 911 operator gave assurance that police protection was on the way and shooting victim consciously waited for officers to arrive at the location based upon that assurance); Noakes v. City of Seattle, 77 Wash.App. 694, 700, 895 P.2d 842 (1995) (reliance found where plaintiffs remained in the house in anticipation of police assistance rather than attempting to escape or to use self-help in removing an intruder). Rather, under the facts submitted, it is likely that given the severity of the heart attack Mr. Cummins was physically unable to move beyond his home and, thus, he was not induced to remain there and/or did not eschew other avenues of help as a result of the 911 call.
¶24 Mrs. Cummins seeks to satisfy the reliance requirement by generally asserting that "[a] caller seeking assistance for a medical emergency does so in reliance on the government's promise [under RCW 38.52.500] to provide a rapid response." Pet. for Review at 12. However, this court cannot as a matter of law use a broad statement of legislative intent as the sole basis from which to find factually that a 911 caller justifiably relied upon a 911 operator's alleged promise of aid. Mrs. Cummins fails to show the necessary reliance.

B. Should we accede to Mrs. Cummins's novel request to relax or eliminate the express assurance requirement in 911 cases where medical aid is sought?
¶ 25 In the face of case law demonstrating she has not satisfied the three elements necessary to establish a "special relationship," Mrs. Cummins asks this court to modify the test for emergency medical condition 911 callers. The rule of law Mrs. Cummins proposes would strike out the "express assurance" element from the "special relationship" determination in 911 medical emergency cases only. Mrs. Cummins does not, however, propose to eliminate application of this requirement for determining a government entity's duty to respond to 911 calls for either police or fire emergencies.
¶26 Mrs. Cummins supports her position by arguing that a municipality's duty to provide emergency medical services is different, and thus distinguishable, from its duty to provide emergency police or fire services. She argues that medical aid focuses on a single individual, whereas the duty to prevent crime is owed to the public at large. "Unlike police protection . ..," she writes, dispatching ambulance services is "not a traditional governmental function provided to the public at large. Instead, government has taken over the role of emergency response and transport formerly performed by private ambulance services. This duty is owed not to the public at large but only to specific individuals requesting assistance." Pet. for Review at 17.
¶27 In response, Lewis County asserts that there is no justification as a matter of law for treating 911 callers differently based on the nature of the caller's emergency. The county notes that the public is encouraged to call 911 in the case of any type of emergency. The county asks us to reject Mrs. Cummins's proposal, arguing that a county's duty to provide 911 services to the public cannot be greater or lesser depending on whether a call is for medical or police aid because it has a statutory obligation to field both kinds of calls. We agree with the county.
¶28 Mrs. Cummins cites no case law from Washington or from other jurisdictions to support her proposition that a governmental unit's duty to respond to a 911 medical emergency caller is somehow greater than that owed to a caller who phones with another type of 911 emergency. As previously defined by this court, a municipality's duty to respond to a 911 call is a general duty owed to all regardless of the type of aid requested.
¶29 The District of Columbia Court of Appeals has rejected an argument similar to that advanced by Mrs. Cummins. In Hines v. District of Columbia, 580 A.2d 133, 135-36 (D.C.App.1990), the decedent's personal representative sued the District for wrongful *465 death damages arising from the alleged negligent dispatch of medical emergency services. The personal representative's claim in that case, similar to that which Mrs. Cummins makes here, was analyzed within the parameters of the public duty doctrine and was dismissed by the trial court on summary judgment. Unlike this case, there was an express promise in Hines by the dispatcher to render aid and emergency aid was actually sentthough it was alleged by the plaintiff that the life support unit was not dispatched in a timely fashion.
¶30 Seeking to get around the public duty doctrine in the District of Columbia case, the personal representative argued on appeal that the doctrine should not apply to calls for emergency medical services. Like the instant case, the personal representative sought to distinguish the duty to dispatch ambulance services from police and fire protection on the basis that emergency medical attention is summoned for and focuses on a particular individual, whereas the duty to prevent crime and protect against fires is owed to the public at large. In rejecting the personal representative's invitation to make such a distinction and to find that an exempted special relationship forms at the exact point in time emergency medical services have been requested, the District of Columbia court wrote:
Virtually every citizen of the District [of Columbia] could find himself or herself in need of assistance from the EAD [Emergency Ambulance Division] at one time or another; if there is a particular "class" of citizens who benefit, its members are distinguished from the general public only in that they are temporarily in need of emergency services. In this, they do not differ from citizens who find themselves in need of emergency police or fire services.
Id. at 138.
¶ 31 The District of Columbia Court of Appeals continued its reasoning by noting that every member of the public may become a "temporary member[ ] of one or more of these `classes' [of persons in need of emergency fire, police, or medical aid] at some time." Id. The court indicated that by virtue of being an individual who calls for emergency medical assistance, the person does not put himself or herself in a class in a "sense that would justify invoking the special relationship exception to the public duty doctrine." Id. In our view, the District of Columbia court's reasoning is logical, and we adopt its reasoning as a basis for rejecting Mrs. Cummins's request to create an exception to the public duty doctrine for medical emergency calls or to impose a heightened duty to respond to only this type of call.
¶32 Like the District of Columbia case law, jurisprudence from this state does not define the duty owed by a government entity to respond to a member of the public based upon the underlying nature of the individual's problem. Rather, Washington courts have applied the public duty doctrine uniformly in a variety of governmental negligence claims,[8] and where duty is analyzed based upon the assertion of a special relationship exception, the courts look to the manner and extent of contact between the government official and the member of the public and also look to how explicit were the assurances of aid allegedly created thereby. Mrs. Cummins provides neither a strong public policy nor a sound legal argument for moving away from this line of analysis.

IV. CONCLUSION
¶33 In sum, we conclude that Mrs. Cummins has failed to produce facts which show that she satisfies any one of the three requirements of an actionable special relationship. The record demonstrates that the county was merely carrying out responsibilities it generally owed to the public when it fielded Mr. Cummins's call and that no common law duty was owed to Mr. Cummins individually or as a member of a particular class under these circumstances. Additionally, we decline Mrs. Cummins's invitation to depart from existing Washington precedent *466 by eliminating the express assurance requirement of the special relationship test in only those cases involving 911 calls and medical emergencies. The Court of Appeals is, therefore, affirmed.
Concurring: MADSEN, BRIDGE, OWENS, FAIRHURST, J.M. JOHNSON, JJ.
CHAMBERS, J. (concurring).
¶34 Lewis County should not be allowed to ignore Leon Cummins' call for medical assistance with absolute impunity simply because the operator failed to say some magic words of assurance. On the contrary, Lewis County has a duty to exercise ordinary care considering all of the circumstances. However, I conclude that there is no evidence that the county, at any time during the incident, breached its duty of care. I therefore concur in result. I write separately because I believe this court continues to confuse and misapply the public duty doctrine.
¶ 35 The modern public duty doctrine ignores Washington's legislative waiver of sovereign immunity by creating a backdoor version of government immunity unintended by the legislature. It directs this court's attention away from its proper considerations of policy, foreseeability, and proximate cause in favor of a mechanical test that will inevitably lead us to absurd results. The public duty doctrine undercuts legislative intent, is harmful, and should either be abandoned or restored to its original limited function.
¶36 Although it began its life with a legitimate purpose, the public duty doctrine is now regularly misunderstood and misapplied. Its original function was a focusing tool that helped determine to whom a governmental duty was owed. It was not designed to be the tool that determined the actual duty. J & B Dev. Co. v. King County, 100 Wash.2d 299, 303-05, 669 P.2d 468 (1983). Properly, the public duty doctrine is neither a court created general grant of immunity nor a set of specific exceptions to some other existing immunity. Id. at 303-04, 669 P.2d 468 (explaining doctrinal differences between the public duty doctrine and sovereign immunity). The doctrine was a judicial creation and has evolved on a case-by-case basis with this court looking only backward, seizing the doctrine and molding it to the facts of whatever case is currently before it. This court has never once laid out an analytical basis for the doctrine, nor ever meaningfully explained why it is applied to some tort actions and not others. This court has never looked with foresight to consider the potential ramifications of its judicial interference with the legislative waiver of sovereign immunity. For these reasons, it is time we reexamined the public duty doctrine, starting with its history.

EARLY DEVELOPMENT OF THE PUBLIC DUTY DOCTRINE IN WASHINGTON
¶37 The Washington legislature abolished state sovereign immunity in 1961 and extended the abolition to all political subdivisions in 1967:
The state of Washington, whether acting in its governmental or proprietary capacity, shall be liable for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation.
RCW 4.92.090.
All local governmental entities, whether acting in a governmental or proprietary capacity, shall be liable for damages arising out of their tortious conduct ... to the same extent as if they were a private person or corporation.
RCW 4.96.010(1).
¶38 By this act, the legislature promised the people of this state that the government and its agents would exercise reasonable care or would be held accountable just like any private person or corporation. In our courts of law, every party should be treated equally. It is contrary to fundamental principles of law that one party be granted a special set of rules not afforded to others.
¶39 However, because the business of government can be different from that of a private person or corporation, courts began drawing distinctions between the two. For instance in 1965, this court following the United States Supreme Court's decision in Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), recognized *467 the doctrine of "discretionary immunity" for high-level policy decisions made by the executive branch. Evangelical United Brethren Church v. State, 67 Wash.2d 246, 253, 407 P.2d 440 (1965).
¶40 The Evangelical case was, in my opinion, correct not only in result but in its articulation of the underlying principles and the appropriate analytical roles of policy, foreseeability, proximate cause, and damages. Sound public policy based upon separation of powers supports quasi-legislative, quasi-judicial, and executive discretionary immunity. Discretionary acts are immune from suit, not merely because federal law originally immunized them but also because, as Justice Robert H. Jackson noted, "it is not a tort for government to govern." Dalehite, 346 U.S. at 57, 73 S.Ct. 956 (Jackson, J., dissenting) (citing former 28 U.S.C. § 2680). Due respect for coordinate branches of government prevents courts from second guessing the discretionary decisions of the executive and legislative bodies. But operational decisions and actions implementing policy, should be, and are, subject to objective standards of care and fall outside the scope of discretionary immunity. Cf. id. at 57-60, 73 S.Ct. 956.
¶ 41 The public duty doctrine primarily began its useful life as a tool to assist courts in determining the intent of legislative bodies when interpreting statutes and codes. Cf. Halvorson v. Dahl, 89 Wash.2d 673, 676-78, 574 P.2d 1190 (1978) (discussing underlying principles; upholding a cause of action against the city of Seattle for inadequate enforcement of fire codes). If a legislative body imposes an enforceable duty upon a government agency, we must still determine the class of persons intended to be protected by the statute or ordinance. Braam v. State, 150 Wash.2d 689, 711-12, 81 P.3d 851 (2003); Bennett v. Hardy, 113 Wash.2d 912, 921, 784 P.2d 1258 (1990). Until this court's decision in Chambers-Castanes v. King County, 100 Wash.2d 275, 669 P.2d 451 (1983), the principles that would ultimately become known as the public duty doctrine were primarily applied only when the court first found some type of duty annunciated in a statute or code. See, e.g., J & B Dev., 100 Wash.2d 299, 669 P.2d 468; Halvorson, 89 Wash.2d 673, 574 P.2d 1190; Campbell v. City of Bellevue, 85 Wash.2d 1, 530 P.2d 234 (1975). If the court determined the legislative body intended to protect certain individuals or a class of individuals to which the plaintiff belonged, a duty to that plaintiff, of course, attached. See J & B Dev.; Halvorson; Campbell. If however the duty applied to the public in general, then the court turned to such considerations as whether a "special relationship" existed between the plaintiff and the government, often based on something other than the categories established in the statute. E.g., J & B Dev.; Halvorson; Campbell. In other words, before this court's decision in Chambers-Castanes, no mechanical or rigid rules existed when applying the public duty doctrine as an interpretive tool.
¶ 42 The very first cases in which this court discussed public duty doctrine principles are illustrative. In Campbell, a dead raccoon was discovered in a stream and the police were called. Campbell, 85 Wash.2d at 3, 530 P.2d 234. A neighbor attempted to remove the raccoon and was electrically shocked. Id. It seems that a barebut livewire ran through the creek, providing power to a nearby home. Prior to the accident, a city of Bellevue inspector concluded that the "`wiring running [through] the creek is unsafe and constitutes a threat to life. This situation will have to be corrected immediately or the service will be disconnected.'" Id. at 3-4, 530 P.2d 234. The inspector claimed to have had a conversation with the homeowner but took no corrective action. Id. at 4, 530 P.2d 234. Subsequently, another neighbor, this time six-year-old Eric Campbell, was playing in the stream and received a paralyzing electrical shock. Id. In Campbell, although this court discussed the public duty doctrine it neither adopted nor rejected the doctrine, saying simply:
We have no particular quarrel at this time with the general premise on which the cases relied upon by the City stand [e.g., public duty doctrine cases] .... Nevertheless, we note that running either explicitly or implicitly through some of the leading cases cited by the City is the thread of an exception to the general rule they espouse, i.e., where a relationship exists *468 or has developed between an injured plaintiff and agents of the municipality creating a duty to perform a mandated act for the benefit of particular persons or class of persons, then tort liability may arise.
Campbell, 85 Wash.2d at 9-10, 530 P.2d 234. This court concluded that Bellevue's own code required the city to disconnect the electrical system until it was brought into compliance.
These requirements were not only designed for the protection of the general public but more particularly for the benefit of those persons or class of persons residing within the ambit of the danger involved, a category into which the plaintiff and his neighbors readily fall.
Id. at 13, 530 P.2d 234. We, therefore, found a duty to the class of persons that included the Campbells and held the city liable for its negligent enforcement of its own rules. Id.
¶43 In Halvorson, a city defendant had been dismissed on the grounds that it did not have a tort duty to enforce fire codes. See Halvorson, 89 Wash.2d 673, 574 P.2d 1190. We reversed. While the court did not use the term "public duty doctrine," it clearly articulated its underlying principles. Specifically, we considered the fact that the inspection and enforcement of building codes existed for the "`welfare of the occupants of such buildings.'" Halvorson, 89 Wash.2d at 677-78, 574 P.2d 1190 (quoting former Seattle Housing Code 27.04.020). Therefore, the court found a duty was owed to those who lived in the buildings. The court also noted that if the ordinance was enacted for purposes of public safety or the general welfare, then the duty was not enforceable in tort by any one particular individual. Halvorson, 89 Wash.2d at 676, 574 P.2d 1190 (citing Duran v. Tucson, 20 Ariz.App. 22, 509 P.2d 1059 (1973); Hoffert v. Owatonna Inn Towne Motel, Inc., 293 Minn. 220, 199 N.W.2d 158 (1972); Stigler v. Chicago, 48 Ill.2d 20, 268 N.E.2d 26 (1971)). These later Washington cases are sometimes collectively referred to as the "public duty" cases because courts, in interpreting individual statutes or ordinances, often found that no particular person or class of persons was intended to be protected. See, e.g., Michael Tardif & Rob McKenna, Washington State's 45-Year Experiment in Government Liability, 29 SEATTLE U.L. REV. 1, 48 n. 290 (2005).
¶ 44 In J & B Development, this court interpreted former King County Code 21.48.110 and clearly embraced the public duty doctrine as a way of analyzing when the government might be liable for its tortious conduct "`to the same extent as if they were a private person or corporation.'" J & B Dev., 100 Wash.2d at 304, 669 P.2d 468 (quoting former RCW 4.96.010 (1967)). The J & B Development court pointed out that many acts of government are unique to government, such as the registration of voters. Id. at 305, 669 P.2d 468. The court did not discuss the specific language of the King County Code in question, but concluded that where there was a "general nebulous duty," the special relationship rule becomes a mechanism for focusing upon whether a duty is actually owed to an individual claimant rather than the public at large. Id. The J & B Development court then correctly found that a special relationship existed between the county and the property owner who had relied upon the building department's representations that he could build upon the property. Id. at 306-08, 669 P.2d 468. Again, nothing in J & B Development went to the existence of a duty, but merely to whom the duty applied.
¶45 As can be seen, the public duty doctrine in its early incarnation served as a focusing tool for the court in narrow circumstances. But that was about to change. Unfortunately, in one fell judicial swoop, one poorly analyzed case, Chambers-Castanes, 100 Wash.2d 275, 669 P.2d 451, greatly confused the doctrine. But before discussing Chambers-Castanes, the origin for the ultimate source of the confusion, it is necessary to discuss the importance of "special relationships" in relation to tort law.

THE DIFFERENT MEANINGS OF "SPECIAL RELATIONSHIP"
¶46 The English language has many terms that have more than one meaning. The term "special treatment" is just one example of the many terms that have different meanings *469 depending on context.[1] Within the legal realm, the term "special relationship" also has different meanings depending on the context. The proper legal meaning of this term is critical given that special relationships are often the foundation of the duty giving rise to the tort claim.
¶47 Some torts, for example, those involving the failure to rescue or warn after a gratuitous promise to do so, require some type of representation, either express or implied, by the promisor to the promisee or a third party, to create a special relationship. See generally Brown v. MacPherson's, Inc., 86 Wash.2d 293, 299, 545 P.2d 13 (1975); Jay v. Walla Walla College, 53 Wash.2d 590, 595, 335 P.2d 458 (1959); French v. Chase, 48 Wash.2d 825, 830, 297 P.2d 235 (1956); WILLIAM L. PROSSER, HANDBOOK OF THE LAW OF TORTS § 56 (4th ed.1971). The failure to do what is gratuitously promised, followed by injury stemming from the failure, is the very essence of these types of torts. See RESTATEMENT (SECOND) OF TORTS § 324 (1965). In this context, the assurances made by the promisor both create the relationship as well as define the duty, that is, if the promisor fails to do what he promised to the detriment of the promisee, the duty has necessarily been breached. Importantly, the duty is limited to what is promised. The promise both creates and limits the duty.
¶ 48 Traditionally, the term "special relationship" has had a completely different meaning when used in the context of the public duty doctrine. See, e.g., Bishop v. Miche, 137 Wash.2d 518, 524, 973 P.2d 465 (1999). Under the doctrine, the underlying duty is created either by statute or by common law and is either broad or nebulous. See Dalehite, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427. Often, the underlying duty can be said to be owed to the public at large, like the duty of the legislature to obey its own rules in setting the date for adjournment or the duty of a city council to enact nonvague ordinances. These are duties owed to the public as a whole; the breach of which is not actionable in tort by an individual.
¶49 But in the context of the public duty doctrine, a duty is assumed and the "special relationship" is properly used as a focusing tool to determine to whom that duty is owed. Babcock v. Mason County Fire Dist. No. 6, 144 Wash.2d 774, 786, 30 P.3d 1261 (2001) (quoting Taylor v. Stevens County, 111 Wash.2d 159, 166, 759 P.2d 447 (1988)). Special relationships that focus the government's duty to an individual person may be created either expressly or impliedly. Chambers-Castanes, 100 Wash.2d at 286, 669 P.2d 451. If the relationship is based upon representations, the specifics of the representations are generally immaterial because the assurances do not create, define, or limit the duty because the duty has already been established and is defined by statute or common law.

THE ORIGIN OF THE CONFUSION: CHAMBERS-CASTANES
¶50 Chambers-Castanes involved, like the case before us, a 911 emergency call. Unlike the case before us, in Chambers-Castanes the call requested police assistance instead of medical assistance. It was also a case of first impression, as this court up until that time had not considered government's duty within the context of a 911 call for police assistance.
¶ 51 In Chambers-Castanes, the plaintiffs, husband and wife, were driving through Woodinville during rush hour. Chambers-Castanes, 100 Wash.2d at 278, 669 P.2d 451. Unknown men stopped their pickup truck ahead of Chambers-Castanes, got their attention, and assaulted them. Id. at 278, 669 P.2d 451. Subsequent to the attack, the assailants drove off and then left the immediate area on foot. Id. Police received numerous calls about the incident but did not respond *470 for an hour and a half. Id. at 280, 669 P.2d 451. At one point, the 911 operator told the caller that an officer had been dispatched. Id. at 785, 669 P.2d 451. None had.
¶52 The plaintiffs brought suit against the county, primarily relying on a claim that mirrored the rescue doctrine. Specifically, Chambers-Castanes claimed that "foreseeable reliance on governmental representations creates a special relationship duty." Chambers-Castanes, Reply Br. of Appellants at 9; see also United States v. De Vane, 306 F.2d 182 (5th Cir.1962) (holding that the representations and foreseeable reliance on those representations created a relationship-based duty); United States v. Gavagan, 280 F.2d 319 (5th Cir.1960) (same); Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (same). The trial court granted the county's motion for summary judgment on several grounds, including the public duty doctrine. Chambers-Castanes, 100 Wash.2d at 277, 669 P.2d 451. This court reversed in part.
¶53 Relevantly, the Chambers-Castanes court discussed duty and "special relationship," unfortunately commingling the two meanings of "special relationship" as I have briefly outlined above. The court relied upon the duty to rescue and the duty to warn, as well as various public duty doctrine cases. Although it appears the court understood the difference in the terms it used, it unfortunately did not matter to the court's end result in that case.[2]
¶54 The holding of Chambers-Castanes with respect to police response to 911 calls is clear enough:
[A]n actionable duty to provide police services will arise if, (1) there is some form of privity between the police department and the victim that sets the victim apart from the general public and (2) there are explicit assurances of protection that give rise to reliance on the part of the victim.
Chambers-Castanes, 100 Wash.2d at 286, 669 P.2d 451 (citing Tampa v. Davis, 226 So.2d 450, 454 (Fla.Dist.Ct.App.1969); Sapp v. Tallahassee, 348 So.2d 363, 365-66 (Fla.Dist.Ct. App.1977); Warren v. District of Columbia, 444 A.2d 1, 10 (D.C.1981) (Kelly, J., concurring in part and dissenting in part)).
¶55 The Chambers-Castanes court explicitly held, "the assurances need not always be specifically averred, as some relationships carry the implicit character of assurance." Chambers-Castanes, 100 Wash.2d at 286, 669 P.2d 451; see generally Halvorson, 89 Wash.2d 673, 574 P.2d 1190; Campbell, 85 Wash.2d 1, 530 P.2d 234.
¶56 At common law, the police did not have a duty to respond to citizen calls. Before Chambers-Castanes, this state recognized neither a statutory nor common law duty applicable to 911 calls for police assistance. In essence, the court in Chambers-Castanes simultaneously recognized a new tort while creating a duty to respond to 911 calls for police assistance based upon the common law rescue doctrine principles annunciated in the opinion.
¶57 Unfortunately, we have continued to develop this "tort," as if it were based upon the public duty doctrine, to a point where each subsequent case compounds the confusion established in the previous one. For instance, some of our cases hold that before the State has a duty enforceable in tort law, the plaintiff must demonstrate that the police (or the operators responding to the 911 call) made unequivocal, express assurances that the plaintiff relied upon to his or her detriment. See Babcock, 144 Wash.2d at 789, 30 P.3d 1261; Beal v. City of Seattle, 134 Wash.2d 769, 785, 954 P.2d 237 (1998); Meaney v. Dodd, 111 Wash.2d 174, 179-80, 759 P.2d 455 (1988). In contrast, other cases, *471 most notably Chambers-Castanes, 100 Wash.2d at 286, 669 P.2d 451, hold that there need not always be express assurances because a duty of care is implicit in certain relationships. As developed, this state's judicially created "tort" based upon 911 calls for police assistance is nothing more than the rescue doctrine masked in the guise of the public duty doctrine.
¶ 58 We continue to confuse the "special relationship" exception of the public duty doctrine with the special relationship that creates a duty of care enforceable in tort. As previously stated, while these terms are related, they are analytically distinct concepts. By blurring the two concepts, we run the risk that statutory governmental duties will be limited to circumstances where express assurances are given, or we risk that representations will be used to limit statutory or common law duties owed by the government. If this happens, then courts, of course, will be granting limited immunities to government. Further, if courts require rescue doctrine type assurances as an element to the public duty doctrine "focusing tool" in determining to whom a government duty is owed, absurd results will follow. Because the liability of private persons and corporations is premised upon foreseeability, not assurances, we will not be treating governments "to the same extent as if it were a private person or corporation," as required by statutory mandate. RCW 4.92.090.

911 CALLS FOR MEDICAL TREATMENT
¶59 The policy consideration for calls for medical treatment is fundamentally different from a request for police assistance. See Harris v. Kreutzer, 271 Va. 188, 198, 624 S.E.2d 24 (2006). Importantly, these are not functions unique to government. Hospitals, ambulance services, private persons, and corporations respond to such calls. In fact, the state legislature has, by implication, conceded by statute, that emergency medical assistance is primarily a function of private entities. See RCW 35.21.766. Thus, given that emergency medical assistance is not a unique function of government, when government decides to handle requests for emergency care, it should be held liable for damages for its tortious conduct in the same way as a private person or corporation.
¶60 Imagine for a moment a man who lives two blocks from a hospital. He suffers a heart attack and calls the hospital four times and each time is told, "I will tell the doctor." But each time the operator informs the doctor of the call, the doctor does nothing because, at the time of the call, the doctor is drunk. Would we someday hold that neither the hospital nor the doctor had any duty to the man because no unequivocal express assurance of help was given? Of course, such holding would be absurd, but under the law as it now exists, such a holding is a distinct possibility.
¶ 61 People "are trained, almost from birth, that we should telephone 911 to summon help in the event of a medical emergency." Jeffery D. Hickman, Note, It's Time to Call 911 for Government Immunity, 43 CASE W. RES. L. REV. 1067, 1067 (1993) (footnote omitted). In addition, virtually all first aid courses instruct students to call 911. Indeed, although medical services dispatched by 911 operators are largely privately run, individuals experiencing emergencies are discouraged from calling such services directly. Id. at 1087 (noting that "telephone directories direct callers to dial 911 for emergency assistance").
¶62 In this case, Mr. Cummins had no option but to call 911 for an ambulance. If he called his doctor or a private ambulance directly, he would have been directed to call 911. See Lewis County Website, http://www.co.lewis.wa.us/publicworks/LC _E911FAQ.htm (last visited May 2, 2006) (directing individuals to call 911 when "emergency medical assistance" is needed).
¶63 There is little doubt that the 911 system is very good, and there is a reasonable public perception that calling 911 is significantly preferable to seeking other sources of assistance. Further, there is a perception that the response will be prompt. The government itself has created these perceptions. In my view, a promise of a prompt response to 911 calls for emergency medical assistance can be implied from all of the *472 circumstances, regardless of whether any express assurances are communicated. Requiring an express assurance in every case is the moral equivalent of allowing malpractice suits against a doctor, lawyer, or architect for negligence only when the professional promises a successful outcome. That is not consistent with the waiver of sovereign immunity. Again, the majority has, in my view, impermissibly granted government a special set of rules not afforded to others.
¶64 This court should analyze 911 calls for medical emergencies based not upon confused mechanical application of the public duty doctrine but upon policy considerations, foreseeability, and proximate cause. A government entity that encourages people to call it for medical emergencies should be liable for the foreseeable consequences proximately caused by its failure to exercise ordinary care. Contrary to some concerns, application of traditional tort principles will not open Pandora's box and release dread evils upon an innocent world. In fact, government should be accountable for its actions just as a private party is held accountable. Accountability encourages competency.
¶ 65 Under the facts of this case, the call by Mr. Cummins to the Lewis County Emergency Dispatch Call Center saying, "1018 `E' Street, a heart attack," was sufficient to create a duty on the county to exercise ordinary care under the circumstances. Clerk's Papers at 343-44. However, the public duty doctrine, in my view, is not implicated because we are not analyzing a duty unique to government. In other words, in this case, we need not utilize the public duty doctrine as a tool to determine to whom a statutory duty is owed. The absurdity of the doctrine and its analytical framework comes to light when applied even to the facts of this case. Could Lewis County ignore Mr. Cummins' call with impunity merely because the operator did not say some magic words of assurance as defined by our case law? The answer to that question should be a resounding no!
¶66 But the county did not ignore the call. I concur with the majority in result because, utilizing traditional tort principles, no rational jury could find that the county breached its duty to exercise ordinary care under the circumstances. On the contrary, the county's response was well within ordinary care. The 911 enhanced system indicated that the call was made from a pay phone instead of 1018 "E" Street. The 911 call preceding the "heart attack" call was a prank call from the same pay phone. The operator immediately tried to call the number she was given by the enhanced 911 system, which was the pay phone, while another operator called the 1018 "E" Street address. There was no answer at the pay phone and there was a recorded message at 1018 "E" Street. The operator then dispatched a Centralia police officer to both addresses. An 11-year-old boy admitted to the police officer that he had made a false "heart attack" call from the pay phone.
¶67 Accordingly, I concur with the majority that the trial court did not err in granting summary judgment.
Concurring: SANDERS and C. JOHNSON, JJ.
NOTES
[1] Cummins v. Lewis County, 124 Wash.App. 247, 257, 98 P.3d 822 (2004).
[2] By joint motion, the City of Centralia was dismissed as a party to this review. Thus, Mrs. Cummins sought and was granted review of the Court of Appeals' decision only as it applies to respondent Lewis County. Cummins v. Lewis County, 154 Wash.2d 1030, 114 P.3d 1198 (2005).
[3] See Resp't Lewis County's Mot. to Strike Pet'rs Answer to Amicus Curiae Mem. of Foundation.
[4] The Foundation contends, and the concurrence agrees, that the public duty doctrine wrongly undermines statutory waiver of sovereign immunity under RCW 4.96.010 by judicially imposing what it contends is a second layer of tort liability immunity for government entities. Mrs. Cummins did not make this argument to the trial court, to the Court of Appeals, or to this court in her petition for review. We, thus, decline to consider the Foundation's request. The Foundation is not a party to this case, and its interest in the outcome of it is merely tangential. Under case law from this court, we address only claims made by a petitioner, and not those made solely by amici. Mains Farm Homeowners Ass'n v. Worthington, 121 Wash.2d 810, 826, 854 P.2d 1072 (1993). This opinion, therefore, addresses only those claims raised by Mrs. Cummins in her petition for review.
[5] Lewis County argues that Mrs. Cummins has failed to show that the deceased, Mr. Cummins, was the "heart attack" caller. However, on summary judgment, all evidence and inferences are viewed in a light most favorable to the nonmoving party. That being the case, we must assume that Mr. Cummins placed the "heart attack" call.
[6] We note at this point that Mrs. Cummins points to no express statutorily imposed duty applicable to Lewis County under these circumstances. Rather, she asserts that RCW 38.52.500 provides a 911 medical-emergency caller with an implicit promise that the government entity fielding the call will "provide a rapid response." Pet. for Review at 12. Lewis County counters that under the controlling case law Mrs. Cummins's argument that the government's implicit promise under the E911 statute to promptly dispatch medical aid to save the caller's life cannot be a basis for a court to impose municipal liability. This is also what the appeals court held. Citing to this court's decision in Honcoop as its authority, Division Two stated that an individual cannot rely on broad statements of legislative intent to support a tort action against a public entity. Cummins, 124 Wash.App. at 255, 98 P.3d 822 (citing Honcoop v. State, 111 Wash.2d 182, 188, 759 P.2d 1188 (1988)). We concur with the appeals courts' statutory duty analysis. At most, the E911 statute imposes upon Washington's counties an obligation to have in place an enhanced 911 system by December 31, 1998. See RCW 38.52.510. Mrs. Cummins does not contend that Lewis County breached its statutory duty to have in place an E911 system, and the record shows that the county did, in fact, have such a system in place and operating at the time Mr. Cummins placed the 911 call at issue. Therefore, we discern no basis in the E911 statute upon which to conclude Lewis County had an actionable statutory duty to Mr. Cummins.
[7] The exceptions are (1) legislative intent, (2) failure to enforce, (3) the rescue doctrine, and (4) a special relationship. Babcock, 144 Wash.2d at 786, 30 P.3d 1261.
[8] See, e.g., Bratton, 145 Wash.2d at 577, 39 P.3d 959 (analyzing duty owed by 911 to send police); Babcock, 144 Wash.2d at 785, 30 P.3d 1261 (analyzing duty owed by fire department when fire fighter communicated with plaintiffs in person); Mull v. City of Bellevue, 64 Wash.App. 245, 823 P.2d 1152 (1992) (analyzing government duty owed to building owner).
[1] For example, consider these two uses of the term. "Everyone gets special treatment at [the] Halekulani [Hotel]guests are ... welcomed with chocolates and in-room registration." Expedia.com Special Promotion, htt p://expedia.com/daily/deals/where-the-stars-stay/default.asp (last visited May 2, 2006). It can also be "a euphemism for brutal cruelty often implying torture or death. The Nazis referred certain offenders, especially resistance members and leaders for `special treatment.'" Definitions & Glossary for Shoah or Holocaust Education, http://www.shoaheducation.com/definitions.html (last visited May 2, 2006).
[2] For example, footnote three reveals that the court was relying, to a certain extent, on the rescue exception:

We have also recognized an exception arising in situations where a governmental entity or its agent undertakes a duty to aid or warn a person in danger and fails to exercise reasonable care, and the offer to render aid is relied upon by either the person to whom the aid is to be rendered or by another who, as a result of the promise, refrains from acting on the victim's behalf. Under this exception, commonly referred to as the rescue doctrine, the governmental entity may be liable even if the agent acts gratuitously or beyond his or her statutory authority.
Chambers-Castanes, 100 Wash.2d at 285 n. 3, 669 P.2d 451.