[No. 65618-0-I.   Division One.   February 21, 2012.]

JERRY L. LLOYD, *Appellant*, v. ALLSTATE INSURANCE COMPANY ET AL., *Respondents*.

*Ray C. Brooks*, for appellant.

*Marilee C. Erickson* and *Jason E. Vacha* (of *Reed McClure*), for respondents.

¶1 BECKER, J. — Jerry Lloyd appeals the trial court's grant of summary judgment in favor of two insurance companies in a dispute over the settlement value of his wrecked automobile. We conclude Lloyd has failed to demonstrate the existence of any reasonable dispute concerning the facts that are material to his claims.

## FACTS

¶2 Jerry Lloyd owned a 2005 Chevrolet Malibu Classic that was involved in an accident on August 18, 2008. At the time of the accident, he had an automobile insurance policy with Deerbrook Insurance Company. In the event of a collision, Lloyd's policy permitted him to recover the "Actual Cash Value" of his vehicle, subject to a $500 deductible. Lloyd called Deerbrook to report the accident on the evening of August 18, 2008. He was informed that his claim would be handled by Allstate Insurance Company.

¶3 Allstate asked Lloyd to take the vehicle to an auto shop for an appraisal. The shop examined the vehicle and determined it was a "total loss" because repair costs totaled $7,977.87, which exceeded the value of the car. The motor mounts were cracked, the frame of the car was bent, and the air bag system had to be replaced. Lloyd took the car to two more repair shops for second opinions and was given the same evaluation.

¶4 A technical representative for Allstate went to view the car. This person reported to Autosource Valuation Services, a third party car appraisal service, that the engine was "well-maintained" and the interior, exterior, and tires had been in "good" condition before the collision, except for moderate wear to the seats, minor wear to the carpets, and minor damage to the exterior trim.

¶5 Autosource completed its report on September 4, 2008. The report set the "Total Condition Adjusted Market Value" of the car—before adding sales tax and licensing fees—at $8,510. This value was based on a "typical vehicle" with an odometer reading of 48,990 miles. It took into account the good condition of Lloyd's car, including the well-maintained interior, exterior, and engine. Autosource attached to its report a list of 10 other 2005 Chevrolet Malibu Classics for sale within a 24 mile radius, with prices ranging from $8,899 to $9,995. These cars had odometer readings ranging from 27,009 to 66,859 miles.

¶6 The odometer reading of Lloyd's car was 113,855 miles. An Allstate representative requested a corrected report to account for the higher mileage of Lloyd's car. In the corrected report, Autosource calculated a new value of $5,105 by subtracting $3,405 to account for the higher mileage of Lloyd's car. This report did not alter the original report's statement as to the car's well-maintained interior, exterior, and engine.

¶7 On September 9, 2008, Allstate adjuster Steven Graham telephoned Lloyd to offer him $5,105.00 for the actual cash value of the car. After adding sales tax and fees and subtracting Lloyd's $500.00 deductible, Graham offered Lloyd a net payout of $5,102.18.

¶8 Lloyd refused the offer. He told Graham he had seen comparable cars selling for more and his car was worth more. Graham explained that the car's "very high mileage" reduced its value. Lloyd insisted that the high mileage did not matter because of his car's regular service records. Graham agreed to reevaluate by asking Autosource for a new valuation based on a different methodology. He also told Lloyd he would be willing to consider any market research he could provide.

¶9 Autosource returned a revised report on September 10, 2008. The new report provided two quotes from local car dealers, based on the dealers' professional opinions of the car's actual cash value given its condition and mileage. The

dealers gave quotes of $6,075.00 and $6,500.00, which grew to $6,654.63 and $7,115.75, respectively, after adding sales tax and license fees.

¶10 The next day, Graham called Lloyd to extend a second offer of $6,654.63. Lloyd rejected this offer, stating that he needed between $9,000.00 and $13,000.00 to replace his car. Graham later testified that he was prepared to offer the higher estimate of $7,115.75 to settle the claim, but he did not do so either then or later.

¶11 On October 17, 2008, Allstate received a letter from attorney Alana Bullis, stating that Lloyd had retained her to represent him, that Lloyd wished to invoke the appraisal clause of his policy, and that he had selected an appraiser. Allstate retained an appraiser the same day. The following week, Allstate's appraiser, Mark Olson, prepared a report concluding that Lloyd's car was worth $6,183.79, taking into consideration its "very clean" condition and high mileage. The two appraisers met on October 27, 2008. They agreed on an "Award of the Loss" in the amount of $6,683.79, plus sales tax and licensing fee.

¶12 On November 3, 2008, Graham spoke to Bullis and explained that he would be sending Lloyd a check for $6,815.16. This amount included the full appraisal award, increased by sales tax and fees and decreased by his $500.00 policy deductible. Bullis claimed that Allstate was not entitled to subtract the deductible. Graham asked Olson whether the appraisers had included the deductible in the appraisal award. Olson told him they had not. Lloyd's own appraiser confirmed Olson's answer in a letter to Bullis.

¶13 Before Graham issued the check, however, Lloyd decided that he wanted to keep his car. Graham subtracted $545.38 from the settlement to account for the car's salvage value and sent Lloyd a check in the amount of $6,269.78 on November 26, 2008. Lloyd cashed the check promptly. Later, he changed his mind about keeping the car. He asked Graham to take the car back and repay him the salvage value. On January 21, 2009, Graham issued Lloyd a second

check for the $545.38 salvage value. Lloyd cashed it promptly. As of that date, Allstate had paid Lloyd a total of $6,815.16 in settlement of his claim. Allstate deemed the matter finished and the claim paid.

¶14 On March 6, 2009, Lloyd filed a lawsuit against Allstate, alleging violations of the duty of good faith and fair dealing; violations of various provisions of the Washington Administrative Code; violations of the Consumer Protection Act, chapter 19.86 RCW; and breach of contract. He amended his complaint on June 16, 2009, adding Deerbrook as a defendant. Allstate and Deerbrook moved for summary judgment. The trial court granted summary judgment in favor of the insurance companies. This appeal followed.

¶15 When reviewing an order on summary judgment, we engage in the same inquiry as the trial court. *Cummins v. Lewis County*, 156 Wn.2d 844, 852, 133 P.3d 458 (2006). Summary judgment is proper where the entire record shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Cummins*, 156 Wn.2d at 852. We review the record taking all facts and reasonable inferences in the light most favorable to the nonmoving party. *Babcock v. Mason County Fire Dist. No. 6*, 144 Wn.2d 774, 784, 30 P.3d 1261 (2001).

## BAD FAITH

¶16 Lloyd argues that the insurers breached their duty of good faith and engaged in unfair and deceptive trade practices by extending unreasonably low settlement offers. Because the two offers were unfairly low, he contends, he was compelled to invoke the appraisal clause, incurring additional expense and delay.

¶17 An insurer's duty of good faith includes an affirmative duty to promptly investigate claims and attempt to effectuate fair and equitable settlements, without resort to litigation, arbitration, or appraisal. WAC 284-30-330(6)-(7); *Coventry Assocs. v. Am. States Ins. Co.*, 136

Wn.2d 269, 279-81, 961 P.2d 933 (1998). To establish bad faith, an insured is required to show that the insurer's actions were unreasonable, frivolous, or unfounded. *Mut. of Enumclaw Ins. Co. v. Dan Paulson Constr., Inc.*, 161 Wn.2d 903, 916, 169 P.3d 1 (2007). An insurer does not act in bad faith where it "acts honestly, bases its decision on adequate information, and does not overemphasize its own interest." *Werlinger v. Clarendon Nat'l Ins. Co.*, 129 Wn. App. 804, 808, 120 P.3d 593 (2005), *review denied*, 157 Wn.2d 1004 (2006). The determinative question is the reasonableness of the insurer's actions in light of all the facts and circumstances of the case. *Anderson v. State Farm Mut. Ins. Co.*, 101 Wn. App. 323, 329-30, 2 P.3d 1029 (2000), *review denied*, 142 Wn.2d 1017 (2001). Where reasonable minds could not differ as to the reasonableness of the insurer's actions, summary judgment is appropriate. *See Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999).

¶18 Graham's two settlement offers were both reasonable and based on "adequate information." *Werlinger*, 129 Wn. App. at 808. Allstate promptly and thoroughly investigated Lloyd's loss by sending a field representative to view the car and having the car examined by a private auto body shop. The two offers Graham extended were based directly on Autosource's market research, which incorporated the field representative's observations that the car's interior, exterior, and engine were in good condition. Both offers tendered 100 percent of the actual cash value accorded to the car by Autosource appraisals. There is no evidence that Graham made any attempt to reduce the appraisals arbitrarily.

¶19 Lloyd contends the original Autosource valuation of $8,510 was an accurate representation of his car's value. Because his car's engine was regularly serviced and the car was in otherwise clean condition, Lloyd's theory goes, the field representative who requested the original Autosource valuation made an appropriate decision to ignore the car's high mileage. Therefore, Graham acted unfairly when he

adjusted the value downward and offered a substantially lower figure.

¶20 Lloyd points to no evidence to support this theory. Ample record evidence contradicts it. Graham testified that the initial $8,510 figure was generated in error and that reliance on that figure would have been unreasonable. Graham's testimony is corroborated by the Olson appraisal, which reduced the car's value by $2,500 to account for its high mileage; the corrected Autosource appraisal, which reduced it by $3,405; and Autosource's list of "comparable" cars selling for higher prices, all of which had odometer readings much lower than the reading on Lloyd's car. Lloyd did not rebut this evidence.

¶21 Lloyd also argues that Graham's first offer of $5,105 was unreasonable for the simple reason that it was lower than later appraisals of the car. This theory is also unpersuasive. A mere number comparison is inadequate to show bad faith where the lower offer was reasonable in light of evidence available at the time the offer was made. *See Keller v. Allstate Ins. Co.*, 81 Wn. App. 624, 633, 915 P.2d 1140 (1996) (rejecting a "strict number comparison approach" and concluding an $8,000 offer was reasonable despite a later $75,000 jury verdict).

¶22 Lloyd next argues that Graham violated the insurer's fiduciary duty to give equal consideration to its policyholders' interests when he offered him the low-end figure in the revised report, rather than the high-end figure. Because Lloyd raises this fiduciary duty theory for the first time on appeal, we do not consider it. RAP 9.12.

¶23 Lloyd's final theory is that Graham acted unfairly when he neglected to call Lloyd or his attorney to tender a higher offer based on the higher of the two quotes from local car dealers. This argument is also unpersuasive. Graham testified that when he extended the offer of $6,654.63 in September based on the lower quote, Lloyd told Graham to expect a call from "his attorney" and then hung up the phone. It was not unreasonable for Graham to await contact

from the as yet unidentified attorney, rather than to call Lloyd back to try to settle the claim. *See* WAC 284-30--330(19) (prohibiting an insurance company from "negotiating or settling a claim directly with any claimant known to be represented by an attorney without the attorney's knowledge and consent"). And once Graham received a letter from Bullis invoking the appraisal clause of the policy, it was not unreasonable for Graham to proceed down the appraisal route, as Bullis requested.

¶24 Viewing the evidence in the light most favorable to Lloyd, the record presents no legitimate dispute concerning the reasonableness of the insurers' actions regarding Lloyd's claim. Lloyd has pointed to no evidence showing that Graham behaved dishonestly, arbitrarily, or anything other than reasonably in settling his claim. The claims alleging bad faith and unfair or deceptive acts were properly dismissed.

## BREACH OF APPRAISAL AWARD

■■■ ¶25 The appraisal award provided, "We, the undersigned, having completed the appraisal process, hereby render an Award of the Loss in the amount of: $6,683.79 + Sales Tax Lic. Fee."

¶26 Lloyd's breach of contract claim alleges that the insurers breached the terms of the appraisal award when they subtracted his $500 policy deductible from the award.

¶27 Lloyd concedes that the insurers were entitled under his insurance policy to subtract the $500 deductible from a determination of the "actual cash value" of the car after a collision. He contends that because the appraisal award used different terminology—referring to an "award of the loss" rather than an "actual cash value"—the insurers had no authority under his policy to subtract the deductible.

¶28 Where it describes the appraisal process, the policy employs both terms:

> Both you and The Company have a right to demand an appraisal of the loss. . . . Each appraiser will state the actual cash value and the amount of loss. . . . A written decision . . . will determine the amount of the loss.

Olson explained to Graham that he understood the appraisal award to be a determination of the "actual cash value" of Lloyd's car that "in no way took into consideration the $500.00 deductible." Lloyd's appraiser wrote to Bullis confirming Olson's explanation. Graham testified that in his role as a claims adjuster, he routinely subtracted deductibles from "any claim that we settle for a policy-holding insured customer," without regard to whether the settlement occurred via the appraisal clause or by ordinary negotiation.

¶29 Considering this evidence along with the language of the policy and the language of the award, we conclude the appraisers' use of the phrase "award of the loss" did not mean that they failed to find the actual cash value. It is plain that the award of the loss was for the actual cash value. This conclusion is consistent with the general rule, cited by Lloyd, that an appraised award is conclusive as to the amount of loss. *Bainter v. United Pac. Ins. Co.*, 50 Wn. App. 242, 748 P.2d 260, *review denied*, 110 Wn.2d 1027 (1988).

## DAMAGES

¶30 Lloyd claims he is entitled to additional economic damages for loss of use, costs related to submitting to the appraisal process, paying out-of-pocket for repairs, and waiting to receive his settlement "for some time." He claims entitlement to ongoing damages until Allstate repays his $500 deductible.

¶31 Lloyd's claim that he is entitled to damages for having to submit to the appraisal process is unsupported. He invoked the appraisal clause after refusing two prompt and reasonable offers by Allstate. There is no evidence that

Graham was an unwilling negotiator. This claim could have been settled reasonably without turning to the appraisal process. Graham's second offer was $1,000 higher than his first offer, and he testified that he was prepared to extend an even higher offer in order to settle the claim, but Lloyd ended the call before he could do so.

¶32 Because Lloyd has failed to raise any genuine dispute that the insurers breached any duty they owed to him, his other theories of inadequate damages are unfounded. The insurers were contractually entitled to subtract his $500 deductible. Lloyd has received a full settlement of his claim under his policy.

¶33 The respondents request an award of fees pursuant to RAP 18.9 for defending a frivolous appeal. The appeal is not "so totally devoid of merit that there was no reasonable possibility of reversal." *Streater v. White*, 26 Wn. App. 430, 434-35, 613 P.2d 187, *review denied*, 94 Wn.2d 1014 (1980). The request is denied.

¶34 Affirmed.

Cox and Appelwick, JJ., concur.