[No. 23773-0-I.   Division One.   July 31, 1989.]

ILA A. MCKASSON, ET AL, *Appellants*, v. THE STATE OF WASHINGTON, ET AL, *Respondents*.

*Rodney Harmon* and *Geraghty, VanDerhoef & Harmon,* for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *Mary E. Combo, Assistant,* for respondent State.

*Joel E. Wright, Steven G. Wraith,* and *Lee, Smart, Cook, Martin & Patterson,* for respondents Dodd, Coney & Bishop, et al.

FORREST, J.—Appellants McKasson, et al, appeal from the orders of summary judgment dismissing their claims against the State and against the law firm of Dodd, Coney and Bishop, arising out of losses suffered by appellants from their investments in promissory notes secured by deeds of trust, which were facilitated by United Home Loans and serviced by them. We affirm.

### UNDERLYING FACTS
Appellants Ila McKasson and 84 others (hereinafter McKasson) acquired notes secured by deeds of trust

through United Home Loans, Inc. (UHL). UHL advertised for investors seeking relatively high rates of return, and used the funds invested to make secured loans to high risk borrowers who could not qualify for conventional mortgage financing. The loans were secured by deeds of trust on the borrowers' homes, and the investors were designated as beneficiaries under the deeds of trust. UHL also provided services for the investors, including verifying borrowers' credit status, appraising the secured properties, preparing the loan documents and deeds of trust, servicing the loans, and handling foreclosure proceedings when necessary. UHL generated its income from brokerage fees and commissions paid by the borrowers. The investors were to receive regular monthly payments on their notes through UHL.

In the early 1980's, some of the borrowers began defaulting on their loans, and UHL commenced foreclosure actions. The investors were not informed of these defaults, nor were they informed when borrowers paid off early. UHL continued to make the monthly payments to the investors on time. In 1984, UHL began diverting the distribution of payoffs of loans in order to use those funds to make the monthly payments to other investors. UHL also started using new investment money to make the monthly payments without ever making loans with the new money. In 1986, UHL failed and declared bankruptcy. Many investors lost their investments because the security for the loans had been released after payoff, which the investor did not receive, or because their investments had been used to make payments to prior investors rather than to make secured loans.

### FACTS INVOLVING THE STATE

In 1982, the Securities Division of the Department of Licensing for the State notified UHL that it was selling nonexempt securities and therefore must register pursuant to the securities act, RCW 21.20. UHL filed its first registration statement on September 20, 1982. In December 1982, the Securities Division notified UHL that audited

financial statements were required as part of its registration. In January 1983, the Division promulgated regulations for the registration of real property securities dealers such as UHL. These regulations, WAC 460–33A, included a requirement for annual audited financial statements and a mechanism for waiver of the audit requirement when it "would cause undue hardship and where good cause is shown." Former WAC 460–33A–110(2). Later that month, UHL's registration was approved without audited financial statements having been provided.

UHL received additional registration permits in 1984, 1985 and 1986. No audited financial statements were ever required of or received from UHL. The Division asserts that it made the decision not to require audited statements from UHL because the investors were protected through their deeds of trust on the subject properties. McKasson asserts that had the audited statements been required and received, the "Ponzi scheme" would have been detected, reducing or eliminating their losses.

### FACTS INVOLVING DODD, CONEY & BISHOP

In 1981, UHL retained Dodd, Coney and Bishop (DC&B) to handle its foreclosures against the defaulting borrowers. In 1981 and 1982, DC&B was asked to review the forms and procedures used by UHL and its sister company Reliable Escrow Services, Inc. (Reliable). UHL was preparing the loan documents and deeds of trust in the transactions it was brokering, and Reliable was performing escrow services for the transactions. On November 9, 1981, William Bishop of DC&B advised UHL of recent Washington cases analyzing whether a provider of escrow services was engaged in the practice of law. His advice was to "continue as you are presently doing" until the "dust settles a bit" and until they discussed the matter.

### PROCEDURAL FACTS

McKasson brought an action against the State, DC&B, and a number of other parties. McKasson and the State brought cross motions for summary judgment regarding the

failure to require audited statements. The court granted summary judgment in favor of the State, ruling that the public duty doctrine immunized the State from liability and that the "failure to enforce" exception to that doctrine was inapplicable. McKasson and DC&B filed cross motions for summary judgment regarding DC&B's liability for aiding and abetting UHL and Reliable in the unauthorized practice of law. The court granted summary judgment in favor of DC&B, ruling that no cause of action existed for aiding and abetting the unauthorized practice of law resulting from an attorney's advice to a client. The remaining defendants were dismissed through settlement or bankruptcy and are not parties to this appeal.

CLAIMS AGAINST THE SECURITIES DIVISION

McKasson argues the traditional analysis as follows: (1) citing RCW 4.96.010 for general governmental liability for tortious acts of its officers and agents; (2) recognizing the "public duty exception"; (3) relying on the "failure to enforce" exception to the public duty exception; and (4) relying factually on the failure to require the audited statements as a failure to enforce.

█ Although the result would be the same in this case, we find that the approach suggested by the concurring opinion in *Taylor v. Stevens Cy.*[1] provides a more straightforward and conceptually cleaner analysis. As we interpret this view, the court examines the statute in question and the facts alleged by the plaintiff, and then ascertains whether the governmental entity owes a duty to the plaintiff.

The facts are essentially undisputed. As this case is before us on summary judgment, we acknowledge that there could be a question of fact as to whether the acts of the Securities Division constituted a waiver of the requirement for filing the audit report, pursuant to WAC 460–33A. In our analysis of the case, we will assume without deciding

---

[1]111 Wn.2d 159, 172, 759 P.2d 447 (1988) (Utter, J., concurring).

that there was no waiver, rendering the question of fact immaterial.

Turning to the statute in question, the securities act, the significant feature is the express disclaimer contained in RCW 21.20.360:

> Neither the fact that an application for registration under RCW 21.20.050, a registration statement under RCW 21.20.180 or 21.20.210 has been filed, nor the fact that a person or security if effectively registered, constitutes a finding by the director that any document filed under this chapter is true, complete, and not misleading. Neither any such fact nor the fact that an exemption or exception is available for a security or a transaction means that the director has passed in any way upon the merits of qualifications of, or recommended or given approval to, any person, security, or transaction. It is unlawful to make, or cause to be made, to any prospective purchaser, customer, or client any representation inconsistent with this section.

In *Baerlein v. State*,[2] the court rejected a claim based on the alleged failure of the State to enforce the provisions of RCW 21.20 and its own administrative regulations. The court held that the section has the following effect:

> This is a complete disclaimer by the State that any documents filed under the securities act by any security or person registered under the act are true, complete and not misleading. . . .
>
> . . . .
>
> The statutory provisions relied upon by plaintiffs do not indicate a clear legislative intent to impose a duty as to individual investors. Rather, they show an attempt by the legislature to bring order and regulation to the securities industry which will inure to the protection of investors as a class and the public generally.

*Baerlein*, at 233.

In order to distinguish *Baerlein* and to show that the disclaimer does not apply, McKasson emphasizes that her complaint is that the Securities Division failed to require the filing of the audited statements, not that the Division failed to discover the improper acts of UHL. She contends that the Division should either have terminated UHL's license for failure to file, or in the alternative that if the

---

[2]92 Wn.2d 229, 595 P.2d 930 (1979).

audited statements had been received, they would have given knowledge to the Division requiring suspension of UHL's license.

■ The audit requirement was adopted by the Division in January 1983. Nothing in the regulations or in the statutes specifically requires the Division to suspend a license for failure to file audited statements. Indeed, WAC 460–33A–110(2) specifically authorizes a waiver of this requirement, thus indicating it is not considered a crucial tool in administering the securities act. In view of the broad discretion vested in the Director pursuant to the act, we fail to find any mandatory duty for the Division to take specific action in response to the failure of a licensee to file audited statements.

To establish an enforceable duty to act, the plaintiffs rely on *Campbell v. Bellevue,*[3] *Bailey v. Forks,*[4] *Mason v. Bitton,*[5] *Livingston v. Everett,*[6] *Miotke v. Spokane,*[7] and *Honcoop v. State.*[8] None of these cases demonstrate the existence of a duty in this case. In *Bailey,* a city police officer failed to arrest a driver under the influence of alcohol and allowed him to proceed resulting shortly thereafter in a serious accident. The applicable statute, former RCW 70.96A.120(2) provided: "a person who appears to be incapacitated by alcohol . . . *shall* be taken into protective custody by the police . . ." (Italics ours.) In *Campbell,* a city inspector discovered that underwater lights were wired in violation of the city code posing a substantial risk. The

---

[3] 85 Wn.2d 1, 530 P.2d 234 (1975).

[4] 108 Wn.2d 262, 737 P.2d 1257, 753 P.2d 523 (1987).

[5] 85 Wn.2d 321, 534 P.2d 1360 (1975).

[6] 50 Wn. App. 655, 751 P.2d 1199, *review denied,* 110 Wn.2d 1028 (1988).

[7] 101 Wn.2d 307, 678 P.2d 803 (1984).

[8] 111 Wn.2d 182, 759 P.2d 1188 (1988).

applicable code provided, "the building official *shall* immediately sever any unlawfully made connection of electrical equipment . . ." Bellevue Municipal Code 16.32.090. (Italics ours.) In *Livingston,* the animal control officer released a dog which he had reason to believe was dangerous and the dog attacked a child. The ordinance provided that an impounded animal shall be released "if, in the judgment of the animal control officer in charge, such animal is not dangerous or unhealthy." Everett Municipal Code 6.04-.040(E)(1). In each of these "failure to enforce" cases, there was a specific directive to the governmental employee as to what should be done. As pointed out above, there is no such directive in the securities act statutes or the associated regulations. Instead, the statutes and the regulations are replete with "mays", and throughout the statutes, broad discretion is vested in the Director.

The other cases cited by McKasson are inapplicable, as they are not failure to enforce cases. In *Mason,* officers of the Washington State Patrol were involved in a high speed chase in which the pursued car ultimately crossed the median and was involved in a serious accident. The court found a factual issue as to whether the officers violated RCW 46.61.035 which authorizes an emergency vehicle to exceed the speed limit, "so long as he does not endanger life or property", and requires persons to drive, "with due regard for the safety of all persons". In *Miotke,* the State and City violated environmental statutes. The distinction between a governmental entity affirmatively violating a statute or ordinance and failing to enforce a statute or ordinance is obvious.

In support of the contention that the appellants were within the class that the securities act was intended to protect, McKasson cites *Haberman v. WPPSS,*[9] at 125–26, as follows:

---

[9]109 Wn.2d 107, 744 P.2d 1032, 750 P.2d 254 (1987), *appeal dismissed,* __ U.S. __, 102 L. Ed. 2d 15, 109 S. Ct. 35 (1988).

We note that while the purpose of federal securities laws is to maintain the integrity of the secondary securities markets and to enforce disclosure, the WSSA [Washington state securities act] is intended to protect investors.

*Haberman* involved a suit by investors against WPPSS, a municipal corporation, as a seller, pursuant to RCW 21.20-.430. It does not deal with the Securities Division as a regulator. It does not limit *Baerlein* or establish a duty running from the Securities Division to the appellants.

We find that none of the cases cited by appellants are persuasive in establishing a duty in this case. None of the "failure to enforce" cases contain a disclaimer similar to RCW 21.20.360. Each of those cases involve a specific government agent, confronted with a dangerous situation, having a clear duty to remedy the situation. Here, no government agent knew of any risk of harm. At most, the Securities Division knew that a licensee had failed to file a required report; a report which indeed was not considered very important. The Division had no clear duty to act to bring about the filing of the audited statements or to suspend or terminate the license for a failure to file audited statements.

Although it deals with the enforcement of building codes, we find *Taylor,* 111 Wn.2d at 161, provides guidance:

> We hold that Stevens County cannot be held liable for its alleged negligence in administering its building code. The duty to ensure that buildings comply with county and municipal building codes rests with individual builders, developers and permit applicants, not local government.

■■ The court goes on to delineate two narrow exceptions. The first is a special relationship created where:

> (1) there is direct contact between the public official and the plaintiff, (2) the official, in response to a specific inquiry, provides express assurances that a building or structure is in compliance with the building code, and (3) the plaintiff justifiably relies on the representations of the official. The creation of a special relationship between the plaintiff and the public official gives rise to a duty to use reasonable care when furnishing information.

*Taylor,* at 171.

The second is based on knowledge by the governmental entity:

> As to the performance of building code inspections, a duty shall continue to be recognized where a public official knew of an inherently dangerous and hazardous condition, is under a duty to correct the problem and fails to meet this duty.

*Taylor,* at 171–72.

To "know" in this context means actual knowledge. This is demonstrated by the fact that each of the cases cited in which an enforceable duty is found, *Halvorson v. Dahl,* 89 Wn.2d 673, 574 P.2d 1190 (1978); *Campbell; Bailey,* involves actual knowledge.

The application to the Securities Division of these rules for establishing a duty strikes an appropriate balance between the resources and capabilities of the government agency and the purposes of the statute in protecting the public. There were no direct dealings between the appellants and the Securities Division, so no special relationship arose. There was no actual knowledge of fraud being practiced upon the investors, which would be the equivalent in the securities context of a "inherently dangerous and hazardous condition" in the building context. The Division had actual knowledge only of UHL's failure to file audited statements. It had no actual knowledge of the fraudulent practices of UHL. Just as the duty to comply with building codes rests with builders and developers in *Taylor,* the duty to comply with the securities act rests with the individuals licensed thereunder. The trial court was correct in granting the State of Washington's motion for summary judgment.

### AIDING AND ABETTING THE UNAUTHORIZED PRACTICE OF LAW

McKasson asserts that DC&B failed to inform UHL of its obligation to advise investors of the conflict of interest between UHL and the borrowers and to advise both the investors and the borrowers to retain independent counsel. McKasson argues that a majority of the plaintiffs would not have invested in UHL's program had they been informed

that they should retain an attorney, and furthermore, that the minority who would have consulted an attorney would have been advised not to invest. Therefore, appellants contend that DC&B should be held liable as aiders and abetters of the unauthorized practice of law. The trial court granted summary judgment in favor of DC&B, ruling that no cause of action exists for aiding and abetting the unauthorized practice of law resulting from an attorney's advice to a client.

In urging their aiding and abetting theory of liability, McKasson concedes with commendable candor that "plaintiffs are unaware of any case in this jurisdiction or any other in which this issue is addressed." We see no reason to create such a cause of action.[10]

■■ Clearly, this is not a professional malpractice claim. No client–attorney relationship came into being between the appellants and DC&B. *Bowman v. John Doe,*[11] *Sherry v. Diercks.*[12] In *Bowman,* Washington refused to extend professional malpractice protection to third parties. A narrow exception finding a duty by the testator's attorney to the intended beneficiaries was recognized in *Stangland v. Brock.*[13] Summarizing the rationale for finding a duty in this narrow class of cases, the court stated:

> Those courts that have applied the multi–factor test have reasoned that the drafting of the will is intended to affect the beneficiaries, it is foreseeable that the beneficiaries may be

---

[10]DC&B has moved to strike the argument in McKasson's reply brief that the law firm should be held liable for "acting in concert" pursuant to the Restatement (Second) of Torts § 876. Because this issue was not raised in the trial court or in McKasson's opening brief, and because it does not raise a manifest constitutional error, the motion is granted. *State v. Scott,* 110 Wn.2d 682, 688, 757 P.2d 492 (1988).

[11]104 Wn.2d 181, 704 P.2d 140 (1985).

[12]29 Wn. App. 433, 628 P.2d 1336, *review denied,* 96 Wn.2d 1003 (1981).

[13]109 Wn.2d 675, 747 P.2d 464 (1987).

harmed if the will is drafted improperly, the intended beneficiaries would have received benefits but for the attorney's alleged negligence, and if the beneficiaries could not recover for the attorney's alleged negligence, no one could. Under the third party beneficiary theory, courts reason that the beneficiaries of the will are intended to benefit from the relationship between the testator and the attorney drafting the will, because an integral purpose of drafting the will is to provide for the beneficiaries.

(Citation omitted.) *Stangland v. Brock, supra* at 681. The appellants here were unknown and, indeed, unknowable at the time the legal advice was given.

Even if one were to extend the rationale of *Stangland* beyond the facts of the particular case, there is no way that the appellants could possibly come within the ambit of that rationale. The importance of an attorney's loyalty to his client, and his duty to give his best advice for the client's interests without responsibility to third parties is almost too obvious to need citation of authority. The rule of nonliability and the reasons therefor are clearly enunciated in the following cases: *McDonald v. Stewart*,[14] at 440:

The more determinative principle for this case is, as the trial court concluded, that an attorney acting within the scope of his employment as attorney is immune from liability to third persons for actions arising out of that professional relationship.

*D.&C. Textile Corp. v. Rudin*,[15] at 919:

Public policy requires that attorneys—acting strictly in their professional capacities as agents and not as principles—shall be free to advise their clients without fear that the attorney will be personally liable to third persons if the advice the attorneys have given to their clients later proves erroneous. As stated long ago by the Court of Appeals in *Ford* v. *Williams*, (13 N. Y. 577, 584 [1856]): "But where one acts only in the execution of the duties of his calling or profession, and does not go beyond it, and does not actually participate in the trespass he is not liable, though what he does may aid another party in its commission."

---

[14] 182 N.W.2d 437 (Minn. 1970).

[15] 41 Misc. 2d 916, 246 N.Y.S.2d 813 (1964).

*Goodman v. Kennedy,*[16] at 344:

> To make an attorney liable for negligent confidential advice not only to the client who enters into a transaction in reliance upon the advice but also to the other parties to the transaction with whom the client deals at arm's length would inject undesirable self–protective reservations into the attorney's counselling role. The attorney's preoccupation or concern with the possibility of claims based on mere negligence (as distinct from fraud or malice) by any with whom his client might deal "would prevent him from devoting his entire energies to his client's interests" . . . The result would be both "an undue burden on the profession" . . . and a diminution in the quality of the legal services received by the client.

It is vital for clients to be able to rely on the unqualified loyalty of their chosen attorney. It is vital for an attorney to be able to freely advise the client without concern as to possible effects on third parties, even if the advice is inaccurate or ill chosen. We see no reason to extend a duty to parties outside the attorney–client relationship beyond the narrow exception currently recognized in Washington law. The trial court's order dismissing plaintiffs' claims against DC&B is affirmed.

Affirmed.

WINSOR, J., and COLE, J. Pro Tem., concur.

Review denied at 113 Wn.2d 1026 (1989).

---

[16]18 Cal. 3d 335, 556 P.2d 737, 134 Cal. Rptr. 375 (1976).