142 P.3d 654 (2006)
Randy DONOHOE, in his capacity as the Personal Representative of the estate of Florence Byrne Donohoe, Deceased, Appellant,
v.
STATE of Washington, Respondent.
No. 33181-1-II.
Court of Appeals of Washington, Division 2.
August 29, 2006.
*655 Jeffrey a Damasiewicz, Attorney at Law, Aberdeen, WA, for Appellant.
James Harmony, Attorney at Law, Olympia, WA, for Respondent.
HUNT, J.
¶ 1 Randy Donohoe, personal representative of the estate of his mother, Florence Byrne Donohoe (Estate), appeals the trial court's summary judgment dismissal of his action against the State for negligence, based on Pacific Care Center's deficient care of Mrs. Donohoe while residing at its private nursing home. The Estate argues that the trial court misconstrued its claim as "negligent *656 investigation" and erroneously applied the public duty doctrine. Holding that the Estate has no statutory or common law cause of action against the State for failure to control Pacific Care's negligence, we affirm.

FACTS

I. PACIFIC CARE CENTER
¶ 2 Florence Donohoe was a Washington State Department of Social and Health Services (DSHS) client from at least September 1, 1998, until her death. In her 80's, Mrs. Donohoe was living in an adult family home in Hoquiam, chosen and paid for by her family, when her condition began to deteriorate. Among other medical conditions, she suffered incontinence, several falls requiring hospitalization, and severe dementia. She was in need of 24-hour care, which the adult family home was unable to provide.
¶ 3 Preparing to transfer Mrs. Donohoe from privately-financed placement to Medicaid, in December 2001, DSHS conducted a comprehensive assessment to determine her required level of care and her Medicaid eligibility. A DSHS case manager determined that she qualified for Community Options Program Entry System (COPES) federal funding at the nursing home level and informed her family that she needed to be placed in a nursing home.
¶ 4 When Mrs. Donohoe's family learned that their preferred nursing home had no bed space available, they moved her to Pacific Care nursing home in Hoquiam.[1] Pacific Care was owned and operated by Prestige Care, a private company. Pacific Care hired, trained, and supervised its employees, including Mrs. Donohoe's care-givers, over whom DSHS had no control.
¶ 5 DSHS conducted general nursing home licensing and regulatory oversight for Pacific Care, as it does for other nursing homes. At the time of Mrs. Donohoe's admission in December 2001, Pacific Care was a properly licensed nursing home facility in substantial compliance with minimum state requirements.[2]
¶ 6 Several months later, DSHS received two complaints from the Donohoe family about Pacific Care's treatment of Mrs. Donohoe. The first complaint, on April 23, 2002, was that Mrs. Donohoe had fecal matter under her fingernails, that she was not being fed properly, and that she was generally being neglected. On May 3, 2002, DSHS conducted an on-site inspection, noted dry fecal matter under Mrs. Donohoe's fingernails, found no evidence to support the family's other feeding and neglect allegations, and cited Pacific Care for failure to provide Mrs. Donohoe with appropriate personal hygiene services.[3]
¶ 7 DSHS received the second complaint on May 22, 2002, the day after Mrs. Donohoe's family moved her from Pacific Care to the hospital. Her family complained that Pacific Care had not corrected the previous hygiene deficiency, that Mrs. Donohoe had lost 10 pounds during the first two weeks of May, that she had been left lying in feces-soiled linens, and that Pacific Care had failed to notify the family when Mrs. Donohoe had a fever and was not looking well. DSHS conducted another on-site inspection and cited Pacific Care for failing to provide clean *657 bed and bath linens and for violating regulations concerning personal privacy, personal hygiene, and the production of patient records. In response, Pacific Care submitted a plan to correct the deficiencies, which DSHS accepted "as evidence that the cited deficiencies [were], in fact, corrected"[4]
¶ 8 After Mrs. Donohoe's hospitalization, her family did not return her to Pacific Care. Instead, they moved her to a different private nursing home in Shelton. DSHS continued to assess Mrs. Donohoe's Medicaid eligibility and the level of care she needed. Advancing in age and declining in health, she had issued a medical directive that she not be resuscitated. Approximately a year later, she died.

II. PROCEDURE
¶ 9 On behalf of his mother's estate, Randy Donohoe filed a complaint for negligence against Pacific Care, the Pacific Care personnel principally responsible for Mrs. Donohoe's care, the State of Washington (DSHS), and individual State employees. Under the terms of a monetary settlement with the Estate, the trial court dismissed Pacific Care and its employees from the lawsuit. By agreement of the parties, the trial court also dismissed the named individual State employee defendants. Thus, DSHS became the sole remaining defendant.
¶ 10 DSHS moved for summary judgment, arguing that it owed no actionable legal duty to Mrs. Donohoe and that the public duty doctrine barred the Estate's action. The Estate countered (1) that DSHS was liable under a general theory of negligence for having failed to assure Pacific Care's compliance with State nursing home regulations, and (2) that several exceptions to the public duty doctrine applied. The trial court granted the State's motion for summary judgment dismissal of the Estate's action against DSHS, ruling that: (1) "[t]he thrust of the plaintiff's claim against the State [was] `negligent investigation,'" which Washington courts generally do not recognize; and (2) none of the exceptions to the public duty doctrine applied. Clerk's Papers at 605.
¶ 11 Donohoe appeals.

ANALYSIS
¶ 12 The Estate argues that we should reverse the trial court's summary judgment dismissal of its negligence action against the State because the trial court misconstrued the Estate's claim as "negligent investigation" and erroneously applied the public duty doctrine. The Estate's negligence complaint against DSHS, based on Pacific Care Center's deficient care of Mrs. Donohoe, appears to encompass claims for general negligence, failure to warn, and negligent investigation or negligent enforcement of regulatory nursing home standards.
¶ 13 In order to prevail on a negligence claim, however, ordinarily, the Estate would first need to show that the State is not immune from lawsuit and liability. If the Estate could show a waiver of sovereign immunity, it would then need to show that the State owed, and breached, a specific duty to Mrs. Donohoe, distinct from a duty owed to the public in general.
¶ 14 Neither party here, however, has briefed the extent of the State's statutory waiver of sovereign immunity under Revised Code of Washington (RCW) 4.92.090, which, by its plain language, limits the State's "liab[ilty] for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation." Nor does either party address whether, under this broad, though circumscribed waiver of sovereign immunity, there is a private entity analogue for the State's negligent investigation or negligent enforcement of nursing home regulations. We have considered and rejected requesting supplemental briefs on this issue.
¶ 15 Instead, we note our Supreme Court's recent decision in Cummins v. Lewis County, 156 Wash.2d 844, 133 P.3d 458 (2006), which, like many Washington cases, appears to conflate, rather than separately to analyze, *658 sovereign immunity waiver and the public duty doctrine.[5] Because we can resolve the instant case on the public duty doctrine alone, we leave clarification of the interplay between the public duty doctrine and sovereign immunity for another day when the issues are squarely presented and briefed.[6]

I. PUBLIC DUTY DOCTRINE
¶ 16 The Washington Constitution gives our Legislature, not the courts, the power to determine the scope of governmental immunity from lawsuit. Accordingly, the judicially-created public duty doctrine comes into play only in those tort actions for which the Legislature has waived sovereign immunity.
The "public duty doctrine" has modified the traditional concept of sovereign immunity.. . . "The threshold determination in a negligence action is whether a duty of care is owed by the defendant to the plaintiff. Whether the defendant is a governmental entity or a private person, to be actionable, the duty must be one owed to the injured plaintiff, and not one owed to the public in general. This basic principle of negligence law is expressed in the `public duty doctrine'."
Babcock v. Mason County Fire Dist. No. 6, 144 Wash.2d 774, 784-85, 30 P.3d 1261 (2001). See also Cummins, 156 Wash.2d at 852, 133 P.3d 458 (citing Taylor v. Stevens County, 111 Wash.2d 159, 163, 759 P.2d 447 (1988)).

A. Standard of Review
¶ 17 The threshold determination in a negligence action is a question of law, Tincani v. Inland Empire Zoological Soc'y, 124 Wash.2d 121, 128, 875 P.2d 621 (1994), which we review de novo. When reviewing an order of summary judgment, we engage in the same inquiry as the trial court. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c).
¶ 18 We must consider all facts submitted and all reasonable inferences from them in the light most favorable to the nonmoving party. Wilson, 98 Wash.2d at 437, 656 P.2d 1030. But the nonmoving party may not rely on speculation, argumentative assertions that unresolved factual issues remain, or consideration of affidavits at face value.[7]Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wash.2d 1, 13, 721 P.2d 1 (1986).

B. Exceptions
¶ 19 The policy behind the public duty doctrine is that legislation for the public benefit should not be discouraged by subjecting the government to unlimited liability for individual damages. Taylor, 111 Wash.2d at 170, 759 P.2d 447. There are, however, four exceptions to the public duty doctrine: (1) special relationship, (2) legislative intent, (3) failure to enforce, and (4) volunteer rescue. Babcock, 144 Wash.2d at 786, 30 P.3d 1261. *659 If an exception to the public duty doctrine applies, then the State owes a specific duty to the plaintiff, the breach of which is actionable. Taggart v. State, 118 Wash.2d 195, 218, 822 P.2d 243 (1992). But such is not the case here, even if the State has waived sovereign immunity for this type of tort action in general.
¶ 20 The Estate contends that three of the four exceptions, special relationship, legislative intent, and failure to enforce, apply here. We address each of these three exceptions in turn.

1. Special relationship
¶ 21 The Estate argues that (1) the special relationship exception to the public duty doctrine applies between DSHS and Mrs. Donohoe, (2) the State breached the special duty of care it owed to Mrs. Donohoe, and (3) the trial court erred in dismissing the Estate's negligence action. We disagree.
¶ 22 There are two types of special-relationship exceptions to the public duty doctrine. Caulfield v. Kitsap County, 108 Wash.App. 242, 251, 29 P.3d 738 (2001). The first special relationship exception arises if:
(1) there is direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the general public, and (2) there are express assurances given by a public official, which (3) give[ ] rise to justifiable reliance on the part of the plaintiff.
Beal v. City of Seattle, 134 Wash.2d 769, 785, 954 P.2d 237 (1998) (quoting Taylor, 111 Wash.2d at 166, 759 P.2d 447) (emphasis added).[8] An "express assurance" occurs where an individual makes a direct inquiry and the government clearly sets forth incorrect information, the government intends that the individual rely on this information, and the individual does rely on it "to his detriment." Babcock, 144 Wash.2d at 789, 30 P.3d 1261 (quoting Meaney v. Dodd, 111 Wash.2d 174, 180, 759 P.2d 455 (1988)).
¶ 23 In Cummins, our Supreme Court found no special relationship, between a local government-run 911 dispatcher and a decedent, in a wrongful death action alleging governmental liability for failure to send timely medical aid in response to the decedent's 911 emergency call for help. The Court held:
[U]nder the public duty doctrine, [no] actionable "special relationship" is created between a member of the public and a government entity when an individual places a "911 call," identifies the nature of his medical emergency, provides a street address but not his name, and "hangs up" prior to either requesting help or receiving an oral assurance from the operator that medical aid will be dispatched. . . . [T]here is neither a statutory nor a common law duty on the part of a county to dispatch medical aid under such circumstances. We decline also the petitioner's invitation to eliminate the express assurance requirement of the special relationship inquiry in cases involving 911 calls and medical emergencies.
Cummins, 156 Wash.2d at 848, 133 P.3d 458.
¶ 24 Here, as in Cummins, and in contrast with Caulfield, there was no showing that DSHS expressly promised Mrs. Donohoe or her family that it would guarantee Pacific Care's compliance with nursing home regulations or ensure immediate correction of Pacific Care's identified deficiencies. Not only was there no express assurance, but also there was no implied assurance. As the Cummins Court noted, "A government duty cannot arise from implied assurances." Id. at 855, 133 P.3d 458 (quoting Babcock, 144 Wash.2d at 789, 30 P.3d 1261).
¶ 25 The second special-relationship exception derives from the Restatement (Second) of Torts § 315 (1965), which provides:
There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

*660 (b) a special relation exists between the actor and the other which gives to the other a right to protection.

(Emphasis added).[9] Thus, a special relationship may exist "between the defendant and either the third party or the foreseeable victim of the third party's conduct." Caulfield, 108 Wash.App. at 253, 29 P.3d 738 (quoting Niece v. Elmview Group Home, 131 Wash.2d 39, 43, 929 P.2d 420 (1997)).
¶ 26 Only when there is an established special relationship between the defendant and the plaintiff has a defendant in a negligence action generally been held to owe a duty to protect the plaintiff from foreseeable harm by a third party. Hutchins v. 1001 Fourth Ave. Assoc., 116 Wash.2d 217, 227, 802 P.2d 1360 (1991). These relationships are typically custodial or supervisory in nature. Caulfield, 108 Wash.App. at 255, 29 P.3d 738. For example, Washington courts have recognized this type of special relationship, and corresponding duty, between certain individuals and schools, common carriers, hotels, hospitals, business establishments, taverns, possessors of land, and custodial mental institutions. Hutchins, 116 Wash.2d at 228-29, 802 P.2d 1360.[10]
¶ 27 Clearly a private nursing home, such as Pacific Care, falls within this category. Pacific Care owed Mrs. Donohoe a duty to protect her from foreseeable harm by third parties, whether those third parties were Pacific Care's own negligent employees or outside intruders. In fact, Pacific Care acknowledged its breach of this duty when it paid damages to Mrs. Donohoe's Estate for its negligence in providing her care at its nursing home. This special relationship between Mrs. Donohoe and Pacific Care, however, did not similarly create a special relationship between Mrs. Donohoe and DSHS for purposes of the public duty doctrine exception.
¶ 28 The Estate relies extensively on Caulfield in arguing both types of the special-relationship exceptions to the public duty doctrine. We held in Caulfield that "when the County undertook in-home care management for Caulfield, who was already a profoundly disabled, vulnerable adult with multiple sclerosis, a special relationship exception to the public duty doctrine applied." Caulfield, 108 Wash.App. at 245, 29 P.3d 738. But Caulfield does not control here, primarily because unlike the circumstances in Caulfield, critical elements of each of the special-relationship exceptions are missing.
¶ 29 Caulfield was a severely disabled, adult, DSHS client, initially monitored by a designated DSHS caseworker. Id. at 245-46, 29 P.3d 738. Caulfield had multiple sclerosis and only limited use of his hands; he needed 24-hour daily care and assistance with eating, transferring, body positioning, and personal hygiene. DSHS authorized Caulfield to leave the Bremerton nursing home, where he had been living, and to move back into his home, where he was to receive personal in-home care hired by DSHS. Caulfield's DSHS caseworker contracted directly with caregiver James Sellars to provide Caulfield's in-home care. DSHS paid Sellars through the federally-funded COPES program, which funds in-home care for qualified disabled persons, thus enabling them to live independently. Id. at 245-46, 29 P.3d 738.
¶ 30 Caulfield's DSHS caseworker failed to meet with him for one month after his transfer home and placement under Sellars' care. Id. at 246, 29 P.3d 738. When Caulfield's DSHS caseworker finally conducted a reassessment, she noted that his condition had substantially deteriorated during his in-home care with Sellars. Id. Caulfield's DSHS caseworker then arranged to transfer his case to a Kitsap County caseworker for more *661 intensive case management. Id. The County then assumed responsibility for Caulfield's ongoing case management services. Id.
¶ 31 But the County caseworker, who was supposed to provide intensive case management, also failed to meet with Caulfield, to reassess his condition, or otherwise to oversee his in-home care. Id. Thus, Sellars' inadequate care continued unnoticed by the County and unabated. As a result, Caulfield's condition further deteriorated. When he was finally admitted to a hospital emergency room, Caulfield was in critical condition, suffering from infections, malnourishment, weight loss, and other ailments resulting in more serious permanent physical impairment than he would otherwise have suffered from his disease alone. Id.
¶ 32 Caulfield sued Sellars for negligent care that resulted in injuries. Caulfield sued DSHS and the County for negligently managing his in-home care by Sellars. Id. at 245, 247, 29 P.3d 738. The County moved for summary judgment, arguing that, under the public duty doctrine, it owed no duty to Caulfield. Id. at 247, 29 P.3d 738. The trial court denied summary judgment. On appeal, we (1) affirmed a jury verdict allocating 40 percent of the fault to the County, 40 percent to DSHS (with whom Caulfield had settled), and 20 percent to Sellars, id. at 248, 257, 29 P.3d 738; and (2) held that the first type of special-relationship exception applied to both DSHS and to the County. Id. at 252, 29 P.3d 738.
¶ 33 As to DSHS, we reasoned:
The [special-relationship] exception certainly applies to DSHS because (1) there was direct contact or privity between DSHS and Caulfield which set Caulfield apart from the general public and (2) there were express assurances given by [the] DSHS caseworker . . . including case management and crisis intervention, which (3) gave rise to justifiable reliance by Caulfield through his acceptance of the case manager's detailed duties.

Id. (emphasis added).
¶ 34 We further noted that the County's actions also established the first type of special-relationship exception because the County had assumed responsibility for Caulfield's case and it had contracted with DSHS to monitor Sellars' in-home care of Caulfield. In addition, as with DSHS, Caulfield had justifiably relied on the County's assumption of this responsibility to his detriment. Id. We also held that the County's actions established the second type of special-relationship exception because of Caulfield's inability to care for himself, rendering him "completely dependent not only on [his] caregivers but also [his] case managers for [his] personal safety." Id. at 256, 29 P.3d 738.
¶ 35 Mrs. Donohoe's circumstances, however, are factually distinguishable from Caulfield's. Although, like Caulfield, Mrs. Donohoe was a vulnerable adult in need of 24-hour care under the COPES program, she received her care from multiple, nursing-home-provided health care personnel in a private nursing home. In addition, apart from its general public duty to regulate nursing homes, DSHS did not employ, supervise, or otherwise oversee Mrs. Donohoe's care or treatment at Pacific Care. Instead, Pacific Care employed, supervised, and monitored her multiple health care providers in its privately-owned nursing home. Moreover, the record indicates that it was Mrs. Donohoe's family who placed her in Pacific Care and who ultimately removed her.
¶ 36 In contrast, DSHS hired Sellars, a single, in-home caregiver, to provide care for Caulfield in Caulfield's own home.[11] The County caseworker, who replaced the initial DSHS caseworker, was the sole monitor of the quality of care that Sellars was supposed to provide Caulfield in his home. Caulfield's case worker was responsible for "establishing Caulfield's service plans, monitoring his care, and providing crisis management, including terminating in-home care if it was inadequate to meet his needs," as well as making assessment visits. Id. Moreover, because of this isolated one-on-one care arrangement, the County's case management for Caulfield was *662 designed to be more intense than was DSHS's case management of Mrs. Donohoe, which focused on Medicaid and nursing home eligibility requirements, rather than on direct monitoring of Mrs. Donohoe's day-to-day nursing care.
¶ 37 Significantly, Caulfield's government caseworker contracted directly with Sellars to provide Caulfield's in-home care. There were no persons other than Caulfield's government caseworker to monitor the adequacy of his private care from his sole provider, Sellars. And when the DSHS caseworker discovered that Sellars was not providing adequate care, rather than firing him and hiring a competent substitute, DSHS transferred Caulfield's case management to a County case worker, who was to engage in more intensive supervision of Caulfield's care under Sellars.
¶ 38 Caulfield not only had direct contact with his government caseworker, but also, because he was not in a group or nursing home setting, he relied solely on the DSHS/County caseworker to oversee Sellars' care-giving in the isolated setting of his private home. We held in Caulfield that the County case manager had "a duty to use reasonable care . . . to protect Caulfield from Sellars' tortious actions."[12]Id. The County case manager was the only person who owed such a duty to Caulfield and, aside from Sellars, the only person who breached this duty.
¶ 39 Such is not the case here. Pacific Care was solely responsible for hiring and supervising Mrs. Donohoe's daily, private, nursing home caregivers. It was Pacific Care that breached this duty of care and compensated her Estate for its tortious, inadequate care and negligent supervision. As the trial court noted,
Although, there was some direct contact between DSHS and Mrs. Donohoe in order to do assessments to determine the level of care benefits DSHS would pay, there were no express assurances that she could justifiably rely on in order to complete the requirements for the special relationship exception as set forth in Caulfield . . . .
Clerk's Papers (CP) at 605-06. The record supports the trial court's assessments of the facts, taken in the light most favorable to the Estate. And we agree with the trial court's legal reasoning based on these facts.
¶ 40 Furthermore, unlike the government-supervised, in-home-care management arrangement in Caulfield, neither DSHS nor Mrs. Donohoe's DSHS case manager was responsible for her individual daily care while she was a resident in the private nursing home. Rather, Mrs. Donohoe's DSHS case manager was responsible for determining her federal Medicaid eligibility, assessing the level of care or service to which she was entitled by virtue of her medical and health conditions, and assuring the necessary funding for this level of care. As for the private nursing home where Mrs. Donohoe resided, DSHS was responsible only for monitoring Pacific Care's general, regulatory-compliance status and licensing, a duty DSHS owed to the public in general, but not to Mrs. Donohoe individually.
¶ 41 Like the trial court, we can find no Washington case extending this type of special relationship and corresponding duty to a governmental regulatory entity,[13] such as *663 DSHS, charged with licensing and overseeing regulatory compliance by any particular private industry, such as private nursing homes. Additionally, we find no Washington case involving similar facts in which the State has been held liable to a party injured by sub-standard, private nursing home care, absent a special relationship like the one in Caulfield.[14]
¶ 42 We hold that the Estate has not established a special relationship exception to the public duty doctrine and, therefore, has no actionable claim under the common law.

2. Legislative intent
¶ 43 In essence, the Estate alleges that (1) the State negligently investigated and negligently failed to enforce nursing home standards, and (2) chapter 18.51 RCW demonstrates the Legislature's intent to create an actionable duty to protect nursing *664 home residents from such negligence. Again, we disagree.
¶ 44 The legislative intent exception applies "when the terms of a legislative enactment evidence an intent to identify and protect a particular and circumscribed class of persons." Bailey v. Town of Forks, 108 Wash.2d 262, 268, 737 P.2d 1257 (1987). This legislative intent must be clearly expressed, not implied. Ravenscroft v. Wash. Water Power Co., 136 Wash.2d 911, 930, 969 P.2d 75 (1998). To ascertain legislative intent, courts look to the statute's declaration of purpose. Dorsch v. City of Tacoma, 92 Wash.App. 131, 134, 960 P.2d 489 (1998), review denied, 137 Wash.2d 1022, 980 P.2d 1283 (1999).

a. Nursing home's duty of care to residents; cause of action for breach
¶ 45 In the case of nursing home negligence, where substandard care injures a resident, the Legislature has expressly imposed specific duties of care on nursing homes. RCW 74.42.140 provides:

The facility shall care for residents by providing residents with authorized medical services which shall include treatment, medication, and diet services, and any other services contained in the comprehensive plan of care or otherwise prescribed by the attending physician.
(Emphasis added). RCW 74.42.160 provides:

The facility shall provide the nursing care required for the classification given each resident. The nursing care shall help each resident to achieve and maintain the highest possible degree of function, self-care, and independence to the extent medically possible.
(Emphasis added). In addition, RCW 74.34.035(1) requires nursing homes to report abuse of vulnerable adults in their care.
¶ 46 Where substandard care injures a resident, the Legislature has also provided a corresponding cause of action against nursing homes for damages for breaches of their RCW 74.42.140 and 74.42.160 duties. RCW 74.34.200, significantly titled, "Abandonment, abuse, financial exploitation, or neglect of a vulnerable adult  Cause of action for damages  Legislative intent," provides, in pertinent part:
(1) In addition to other remedies available under the law, a vulnerable adult who has been subjected to abandonment, abuse, financial exploitation, or neglect either while residing in a facility or in the case of a person residing at home who receives care from a home health, hospice, or home care agency, or an individual provider, shall have a cause of action for damages on account of his or her injuries, pain and suffering, and loss of property sustained thereby. This action shall be available where the defendant is or was a corporation, trust, unincorporated association, partnership, administrator, employee, agent, officer, partner, or director of a facility, or of a home health, hospice, or home care agency licensed or required to be licensed under chapter 70.127 RCW, as now or subsequently designated, or an individual provider.
RCW 74.34.200(1) (emphasis added).

b. No comparable DSHS duty of care to residents encompassed in regulation of nursing homes
¶ 47 But neither RCW 74.34.200 nor any other statute creates a cause of action for nursing home residents against DSHS for substandard private nursing home care that results in harm to them. On the contrary, the declaration of purpose for RCW 18.51, the chapter governing State regulation of nursing homes, is found in RCW 18.51.005, which provides:
The purpose of this chapter is to provide for the development, establishment, and enforcement of standards for the maintenance and operation of nursing homes, which, in the light of advancing knowledge, will promote safe and adequate care and treatment of the individuals therein. An important secondary purpose is the improvement of nursing home practices by educational methods so that such practices eventually exceed the minimum requirements of the basic law and its original standards.
(Emphasis added). This declaration of purpose demonstrates a clear legislative intent *665 to regulate nursing homes in such a manner as to promote, but not to guarantee, safe care and treatment for residents. Nothing in this declaration of purpose expresses any legislative intent to create a DSHS duty to protect individual residents from inadequate private nursing home care or to indemnify residents for harm resulting from such care.
¶ 48 Rather, to fulfill the purpose of Chapter 18.51 RCW, the Legislature imposed on DSHS a duty to promulgate rules, regulations, and standards for licensed nursing homes, expressly "in the interest of public health, safety, and welfare." RCW 18.51.070. And RCW 18.51.007, titled "Legislative intent," establishes a menu of sanctions from which DSHS may select to obtain nursing homes' compliance with applicable standards of resident care:
It is the intent of the legislature in enacting chapter 99, Laws of 1975 1st ex. sess. to establish[:] (1) a system for the imposition of prompt and effective sanctions against nursing homes in violation of the laws and regulations of this state relating to patient care; (2) an inspection and reporting system to insure that nursing homes are in compliance with state statutes and regulations pertaining to patient care; and (3) a mechanism to insure that licenses are issued to or retained by only those nursing homes that meet state standards for resident health and safety.
(Emphasis added).
¶ 49 Thus, DSHS's statutory duty under Chapter 18.51 RCW is essentially limited to licensing and overseeing nursing homes for compliance with applicable standards. Chapter 18.51 RCW. Although the Legislature has given DSHS progressively more severe sanction tools for attempting to obtain nursing home compliance with these standards, the Legislature has not thereby created a cause of action for nursing home residents when DSHS does not obtain compliance.[15]
¶ 50 That the Legislature has empowered DSHS to protect the public by assuming control of, or even closing down, nursing homes chronically unwilling or unable to comply with these standards does not create an actionable special duty owing personally to Mrs. Donohoe.[16] And even assuming, for summary judgment purposes, that Pacific Care was not in compliance with certain nursing home regulations, the Estate fails to state an actionable claim on which liability can be predicated under the facts here.
¶ 51 We agree with the trial court:
[T]he plaintiff fails to convince [us] that the legislature intended the nursing home regulatory scheme to be for the benefit of the plaintiff individually rather than the public as a whole. Such intent is not clearly expressed, and it cannot be implied. See Ravenscroft v. [Wash.] Water Power Co., 136 Wash.2d 911, 930, 969 P.2d 75 (1998). See also Baerlein v. State, 92 Wash.2d 229, 232, 595 P.2d 930 (1979) and Johnson v. State, 77 Wash.App. 934, 938, 894 P.2d 1366, [review denied, 127 Wash.2d 1020, [904 P.2d 299]] (1995).
CP at 605.
¶ 52 As Division One of this court recently reiterated in Blackwell v. Dep't of Soc. & Health Srvs., "[S]tatutes may create an exception to the common law." 131 Wash.App. 372, 375, 127 P.3d 752 (2006). To that end, *666 our Legislature has enacted statutes imposing liability on nursing homes; but the Legislature has not acted to create an exception to the common law, imposing an actionable duty on DSHS in the nursing home regulatory context. See Chapters 74.42 and 18.51 RCW. "If the duty of care is to be extended. . . , the proper body to make that decision is the Legislature." Blackwell, 131 Wash.App. at 377, 127 P.3d 752 (quoting Pettis v. State, 98 Wash.App. 553, 560, 990 P.2d 453 (1999)). Thus far, our Legislature has not decided to extend such a duty of care to the State.

3. Failure to enforce
¶ 53 The Estate further argues that the "failure to enforce" exception to the public duty doctrine applies here because DSHS knew of Pacific Care's history of statutory violations and failed to take appropriate corrective action. Once again, we disagree.
¶ 54 The failure-to-enforce exception applies "where governmental agents responsible for enforcing statutory requirements possess actual knowledge of a statutory violation, fail to take corrective action despite a statutory duty to do so, and the plaintiff is within the class the statute intended to protect." Bailey, 108 Wash.2d at 268, 737 P.2d 1257. We construe this exception narrowly. Atherton Condo. Apartment-Owners Ass'n v. Blume Dev. Co., 115 Wash.2d 506, 531, 799 P.2d 250 (1990).
¶ 55 This exception applies only where there is a mandatory duty to take a specific action to correct a known statutory violation. Halleran v. Nu West Inc., 123 Wash.App. 701, 714, 98 P.3d 52 (2004), review denied, 154 Wash.2d 1005, 113 P.3d 481 (2005). "Such a duty does not exist if the government agent has broad discretion about whether and how to act." Id. Such is the case here.
¶ 56 DSHS has broad discretionary authority to take a wide variety of enforcement actions when a nursing home fails to comply with state or federal regulations. See RCW 18.51.060(1), (2), (6), (7); RCW 74.42.580. DSHS must impose mandatory sanctions only when (1) the nursing home has been out of compliance with federal regulations for three months, RCW 18.51.060(3)(a); (2) the nursing home has been out of compliance for three consecutive inspections, RCW 18.51.060(3)(b); or (3) the nursing home deficiencies jeopardize resident health and safety, RCW 18.51.060(5)(a)(ii)(A), or seriously limit the nursing home's capacity to provide adequate care, RCW 18.51.060(5)(a)(ii)(B). These mandatory sanctions are economic in nature, involving denial of payment or stopping placement of new residents. But the mandatory nature of these sanctions does not require DSHS to take specific action on behalf of any current individual resident.
¶ 57 Here, Pacific Care was in substantial compliance with state and federal regulations at the time Mrs. Donohoe was a resident there.[17] Thus, any enforcement action by DSHS would have been discretionary, not mandatory. Moreover, the record shows that DSHS did take enforcement action against Pacific Care: DSHS issued multiple citations and required Pacific Care to formulate a plan of correction to resolve enumerated deficiencies.
¶ 58 Neither statutory nor common law recognizes an action for negligent investigation of regulatory nursing home standards in the state of Washington.[18]See Pettis, 98 Wash.App. at 558, 990 P.2d 453 (recognizing the chilling effect such claims would have on investigations). Similarly, in Honcoop v. *667 State, we held that the State's failure to enforce regulations designed to control the spread of diseased cattle did not create a private individual's cause of action for negligence:
Many of the alleged acts of negligence concern the State's failure to adopt and comply with the procedures set forth in the USDA Uniform Rules and the State's alleged ineffective response to the outbreak of brucellosis in Washington. As these decisions involve high level discretionary acts exercised at the executive level, the State is entitled to governmental immunity. See Evangelical United Brethren Church v. State, 67 Wash.2d 246, 255, 407 P.2d 440 (1965).
111 Wash.2d 182, 187 n. 1, 759 P.2d 1188 (1988).[19]See also Baerlein v. State, 92 Wash.2d 229, 595 P.2d 930 (1979) (state securities regulations did not create a duty to protect individual investors).
¶ 59 Accordingly, we hold that the failure-to-enforce exception to the public duty doctrine does not apply under the facts of this case.

III. CONCLUSION
¶ 60 We recite Justice Chambers' concurrence in Cummins, in which he sets forth the evolution of the judicially-created public duty doctrine. He begins this history by noting:
Properly, the public duty doctrine is neither a court created general grant of immunity nor a set of specific exceptions to some other existing immunity. [J & B Dev. Co. v. King County, 100 Wash.2d 299,] 303-04[, 669 P.2d 468 (1983)] (explaining doctrinal differences between the public duty doctrine and sovereign immunity). The doctrine was a judicial creation and has evolved on a case-by-case basis with this court looking only backward, seizing the doctrine and molding it to the facts of whatever case is currently before it. This court has never once laid out an analytical basis for the doctrine, nor ever meaningfully explained why it is applied to some tort actions and not others. This court has never looked with foresight to consider the potential ramifications of its judicial interference with the legislative waiver of sovereign immunity. For these reasons, it is time we reexamined the public duty doctrine, starting with its history.
Cummins, 156 Wash.2d at 862, 133 P.3d 458 (Chambers, J., concurring).[20]
¶ 61 "Generally, a claim for negligent investigation does not exist under common law. But statutes may create an exception to the common law." Blackwell, 131 Wash.App. at 375, 127 P.3d 752 (footnote omitted). Even if the State could be said to have waived sovereign immunity so as to be potentially susceptible to the Estate's lawsuit here, we hold that: (1) Chapter 18.51 RCW, the nursing home regulation statute, does not create an actionable duty that DSHS owes to an individual nursing home resident; (2) any duty that RCW 18.51 imposes on DSHS to oversee nursing homes' regulatory compliance is a duty owed to the public generally, not to individual residents such as Mrs. Donohoe; and (3) any alleged breach of that duty is not actionable by the Estate because Mrs. Donohoe's relationship with DSHS does not fall within any exception to the public duty doctrine. *668 In short, the Estate has no actionable claim under either the common law or statute.
¶ 62 Accordingly, we affirm the trial court's summary judgment dismissal of the Estate's action against the State.
We concur: BRIDGEWATER, P.J. and PENOYAR, J.
NOTES
[1] The record shows that Mrs. Donohoe's family initially selected Grays Harbor Community Hospital Long Term Care, for which DSHS had approved funding. But because there was no opening at that facility, Mrs. Donohoe's family placed her in Pacific Care Center, their non-favored option. DSHS had also approved funding for Pacific Care.

Although at oral argument there appeared to be some dispute about who actually placed Mrs. Donohoe at Pacific Care, nowhere does the record say that anyone other than her family placed her there. According to DSHS's comprehensive assessment, Mrs. Donohoe's family chose her nursing home placement from the available options. At most, according to the Estate's pleadings, this placement occurred with "DSHS involvement."
[2] The record does not support the Estate's assertion that Pacific Care was not in compliance with state regulations when Mrs. Donohoe's family moved her to Pacific Care. The record does include, however, multiple Pacific Care deficiencies over a period of years and DSHS's measures to obtain compliance with applicable standards.
[3] The notice of deficiency stated that a plan of correction was not required because the identified deficiencies were "of isolated scope and had no actual harm with potential for minimal harm."
[4] The record contains evidence of other Pacific Care deficiencies that did not pertain directly to Mrs. Donohoe but that apparently aided the Estate in establishing its negligence claims against Pacific Care and its staff.
[5] In Cummins, the Court notes at the outset:

The public duty doctrine does not serve to bar a suit in negligence against a government entity. As a result of the enactment in 1967 of RCW 4.96.010, which did away with Washington's shield of absolute sovereign immunity, local governments such as a county may be liable for damages arising out of their tortious conduct, or the tortious conduct of [their] employees "to the same extent as if they were . . . private person[s] or corporation[s]." RCW 4.96.010(1); Bailey v. Town of Forks, 108 Wash.2d 262, 265, 737 P.2d 1257, 753 P.2d 523 (1987). In this light, the doctrine serves as a framework for courts to use when determining when a governmental entity owes either a statutory or common law duty to a plaintiff suing in negligence. See, e.g., Jenifer Kay Marcus, Washington's Special Relationship Exception to the Public Duty Doctrine, 64 WASH. L.REV. 401 (1989).
156 Wash.2d at 853, 133 P.3d 458.
[6] In so ruling, we do not mean to suggest that the State has waived sovereign immunity with respect to its regulatory functions.
[7] "[A]fter the moving party submits adequate affidavits, the nonmoving party must set forth specific facts that sufficiently rebut the moving party's contention and disclose that a genuine issue as to the material fact exists," based on admissible, personal knowledge of a competent affiant. CR 56(e); Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wash.2d 1, 13, 721 P.2d 1 (1986).
[8] We applied this type of special relationship exception to Caulfield's relationship with both DSHS and the County in Caulfield, 108 Wash. App. at 252, 29 P.3d 738.
[9] We held that this second type of special relationship exception applied to the County in Caulfield, 108 Wash.App. at 255-56, 29 P.3d 738. Here, however, we agree with the trial court that the second type of special-relationship exception did not apply to DSHS's relationship with Mrs. Donohoe.
[10] Hutchins involved summary judgment dismissal of a negligence action against a land owner who the plaintiff asserted was liable for others' criminal acts on his land. The Court in Hutchins held: "[A] possessor of land has no generalized duty to provide security measures on the premises so as to protect those off the premises, including passersby, from third party criminal activity on the premises." 116 Wash.2d at 233, 802 P.2d 1360.
[11] That both Caulfield and Mrs. Donohoe were participants in the same federally funded COPES program has no bearing on the issue of duty here, especially where Caulfield qualified for in-home care, while Mrs. Donohoe required and qualified for nursing home care.
[12] Washington courts describe relationships between a defendant and a foreseeable victim with whom the defendant has a special relationship as "protective in nature." Historically, such relationships have involved "an affirmative duty to render aid." Caulfield, 108 Wash.App. at 253, 29 P.3d 738 (quoting Hutchins, 116 Wash.2d at 228, 802 P.2d 1360). Such was the case in Caulfield, where Caulfield received private, in-home individual care from a single care giver, initially hired by DSHS and later supervised by the County. But such was not the case with Mrs. Donohoe's residence at Pacific Care.
[13] Although not a regulatory case, our Supreme Court recently explained in Cummins that the establishment of emergency response systems by governments does not thereby create a special relationship with whoever seeks aid. Although 911 emergency medical services focus on the individual requesting aid, this circumstance does not transform a governmental duty owed to the public at large into a duty owed to an individual. Quoting from Hines v. District of Columbia, 580 A.2d 133, 138 (D.C.App.1990), our Supreme Court noted: "[I]f there is a particular `class' of citizens who benefit, its members are distinguished from the general public only in that they are temporarily in need of emergency services." Cummins, 156 Wash.2d at 859, 133 P.3d 458.

Similarly, here, although nursing home residents, such as Mrs. Donohoe, are a particular "class of citizens" who benefit from state nursing home regulation, nursing home residents similarly "are distinguished from the general public . . . in that they are temporarily in need of [such] services." As with emergency services, any member of the public can find himself or herself in need of nursing home services at almost any point in life, for varying periods of time, as a result of injury, illness, or some other debilitating condition.
[14] We note, however, the following excerpt from a wrongful death action in which an estate sued the State of Georgia for failure to enforce water temperature regulations at a private nursing home where the decedent died from being bathed in scalding water:

"The [Georgia] Legislature enacted the GTCA [Georgia Tort Claims Act], O.C.G.A. [Official Code of Georgia Annotated] § 50-21-20 et seq., in order to balance strict application of the doctrine of sovereign immunity against the need for limited exposure of the State treasury to tort liability." Ga. Ports Auth. v. Harris [, 274 Ga. 146, 549 S.E.2d 95, 99 (2001).] While recognizing "the inherently unfair and inequitable results which occur in the strict application of the traditional doctrine of sovereign immunity," the legislature also realized that "in acting for the public good and in responding to public need, state government must provide a broad range of services and perform a broad range of functions throughout the entire state, regardless of how much exposure to liability may be involved." O.C.G.A. § 50-21-21(a). With this in mind, the legislature concluded that "the exposure of the state treasury to tort liability must therefore be limited," and that "state government should not have the duty to do everything that might be done." Id. Accordingly, the legislature declared it to be "the public policy of th[e] state that the state shall only be liable in tort actions within the limitations of" the Act. Id.
Lewis v. Dep't of Human Res., 255 Ga.App. 805, 567 S.E.2d 65, 68-69 (2002) (footnote omitted). Unlike Washington's statutory waiver of sovereign immunity, Georgia's legislature has carved out clear "exceptions" barring legal action for state "inspection and licensing," thus expressly rendering Georgia immune from liability for the exercise, or non-exercise, of its regulatory functions.
Nonetheless, the Georgia court held that: (1) the proximate cause of Lewis's death was a private nursing home employee placing the decedent into scalding water on private premises, (2) "[t]he state . . . had neither the authority nor the ability to prevent the employees of [the private nursing home] from putting him into the scalding water," and (3) the state was not the proximate cause of death even though it failed to enforce required water temperature regulations. Lewis, 567 S.E.2d at 69.
We further note that Vermont has waived its sovereign immunity in a statute similar to Washington's. See 12 V.S.A. [Vermont Statutes Annotated] § 5601. Consistent with the plain language of Vermont's statutory waiver, the Supreme Court of Vermont has held that the state government: (1) may be liable only to the extent a plaintiff's cause of action is comparable to a recognized cause of action against a private entity, Denis Bail Bonds, Inc. v. Vermont, 159 Vt. 481, 622 A.2d 495, 498 (1993); (2) remains immune "for governmental functions for which no private analog exists," LaShay v. Dep't of Soc. & Rehab. Servs., 160 Vt. 60, 625 A.2d 224, 229 (Vt.1993); and (3) is not liable for the negligence of licensed industries because there is no private analog for a claim of negligent enforcement of safety standards under a regulatory scheme, Lafond v. Dep't of Soc. & Rehab. Servs., 167 Vt. 407, 708 A.2d 919, 922 (1998).
Florida has a waiver-of-sovereign-immunity statute similar to Washington's and Vermont's. See Fla. Stat. § 768.28. In a negligence action against the State of Florida, arising from harm caused by a licensed day care facility, the Florida Court of Appeals held that the State's issuance of a permit to the daycare facility was part of a regulatory enforcement function, for which no State liability attached. Brown v. Dep't of Health & Rehab. Servs., 690 So.2d 641, 643 (Fla.Dist.Ct. App.1997). It went on to state that the State's monitoring of permit conditions (for example, in private daycare facilities and nursing homes) is similar to building inspection, which is within the enforcement realm of government and similarly not subject to liability. Brown, 690 So.2d at 643.
[15] Instead, the Legislature has vested DSHS with discretion to decide whether ultimately to impose the most drastic sanction on a nursing home that has failed to comply with standards  suspension of its license, taking over its management, or closing it down altogether. RCW 18.51.060(1), (2), (6), (7).
[16] Similarly, in the context of investors' action for investment losses based on the State's failure to require an audit from a bankrupt loan company, licensed by the State, Division One of this court held:

The audit requirement was adopted by the [Securities Division of the State Department of Licensing] in January 1983. Nothing in the regulations or in the statutes specifically requires the Division to suspend a license for failure to file audited statements. Indeed, WAC 460-33A-110(2) specifically authorizes a waiver of this requirement, thus indicating it is not considered a crucial tool in administering the securities act. In view of the broad discretion vested in the Director pursuant to the act, we fail to find any mandatory duty for the Division to take specific action in response to the failure of a licensee to file audited statements.
McKasson v. State, 55 Wash.App. 18, 24, 776 P.2d 971, review denied, 113 Wash.2d 1026, 782 P.2d 1069 (1989).
[17] The Estate lists various Pacific Care violations, but the record does not indicate whether Pacific Care failed to comply with regulatory sanctions that DSHS imposed. The party seeking review bears the burden of perfecting the record so that the court has before it all of the evidence relevant to the issue. Dash Point Village Assocs. v. Exxon Corp., 86 Wash.App. 596, 612, 937 P.2d 1148 (1997). Thus, we are left with DSHS's expert declaration that Pacific Care was in substantial compliance with nursing home regulations.
[18] Washington does, however, recognize an exception for negligent investigation of child abuse allegations. Pettis, 98 Wash.App. at 559, 990 P.2d 453. This exception to the public duty doctrine is based on legislative intent. Yonker v. Dep't of Soc. & Health Servs., 85 Wash.App. 71, 81-82, 930 P.2d 958, review denied, 132 Wash.2d 1010, 940 P.2d 655 (1997). But this exception does not apply here, especially in light of the contrary legislative intent for investigation of nursing home standard violations. See section II. B. of our Analysis, supra.
[19] Also framing the Honcoop holding in terms of the special relationship exception, our Supreme Court noted:

The public duty doctrine provides that regulatory statutes impose a duty on public officials which is owed to the public as a whole[] and that such a statute does not impose any actionable duty that is owed to a particular individual. Bailey v. Forks, 108 Wash.2d 262, 265-66, 737 P.2d 1257 (1987); Chambers-Castanes v. King Cy., 100 Wash.2d 275, 284, 669 P.2d 451 (1983).
Honcoop, 111 Wash.2d at 188, 759 P.2d 1188.
[20] We will not exacerbate this "judicial interference with the legislative waiver of sovereign immunity" here. Nor will we create, or extend, a duty of care and potential liability here. As we noted at the outset of this opinion, our state Constitution clearly authorizes the Legislature, not the judiciary, to determine to what extent it will waive sovereign immunity. In spite of waiving sovereign immunity for the State's tortious conduct to the extent it would be liable as a private entity, the Legislature has not acted to waive sovereign immunity, to impose an actionable duty, or to expose the State to liability for its tortious conduct in the private nursing-home regulatory context. We will not act judicially to create such a State duty and corresponding liability. In our view, such a policy decision is for the Legislature, not the courts.